OPINION OF THE COURT
Denise A. Hartman, J.
In January 2012, Governor Andrew Cuomo issued Executive Order No. 38 (9 NYCRR 8.38) directing the Department of Health, among other agencies, to promulgate regulations (a) requiring that at least 75% of state financial assistance or state-authorized funds be used for direct care or services; and (b) prohibiting the use of such funds for executive compensation in excess of $199,000 per year. In May 2013, the Department of Health adopted final regulations imposing these limits on administrative costs and executive compensation of care providers that receive state financial assistance or state-authorized funds {see 10 NYCRR part 1002). Going beyond the terms of the executive order, the regulations also impose a “soft cap” on executive compensation from all sources—including non-taxpayer funds—except under certain conditions {see 10 NYCRR 1002.3).
Plaintiffs-petitioners (collectively petitioners) are multiple not-for-profit and for-profit health care providers, managed care plans, and trade associations. They commenced these two hybrid declaratory judgment actions/CPLR article 78 proceedings to challenge the Executive Order and the Department of Health’s regulations. By order dated August 13, 2014, Supreme Court (Ceresia, J.) consolidated the cases and dismissed pursuant to CPLR 3211 (a) (7) all causes of action but those alleging a violation of the separation of powers doctrine and that the regulations are arbitrary and capricious. Defendants-respondents, the Department of Health and its Commissioner and the Governor (collectively respondents), then answered. The court heard oral argument on September 2, 2015.
The court concludes that, with the exception of the “soft cap” provision imposing limits on executive compensation regardless of the source of funds, the Department of Health regula *597 tions implementing the Executive Order do not violate the separation of powers doctrine, nor are they arbitrary and capricious.
Background
In January 2012, Governor Cuomo issued Executive Order No. 38 declaring that the State has “an ongoing obligation to ensure that taxpayers’ dollars are used properly, efficiently and effectively,” and that “in certain instances providers of services that receive State funds or State-authorized payments have used such funds to pay for excessive administrative costs and outsized compensation for their senior executives, rather than devoting a greater proportion of such funds to providing direct care or services to their clients” (Executive Order [Cuomo] No. 38 [9 NYCRR 8.38]). In an effort to focus taxpayers’ dollars on paying for direct care and services to those in need, the Executive Order directed agencies that give state financial assistance or state-authorized payments to providers of care or services to promulgate regulations requiring that no less than 75% of state financial assistance or state-authorized payments to a provider for operating expenses shall be for direct care or services rather than administrative costs. It directed agencies to ratchet up the minimum direct care percentage to 85% by April 1, 2015.
The Executive Order also directed “ [t] o the extent practicable” that reimbursement with state financial assistance or state-authorized funds shall not be provided for compensation paid to any executive in an amount greater than $199,000 per year (9 NYCRR 8.38 [2] [b]). It permitted the agencies to adjust that figure annually, subject to the approval of the director of the budget, but not to exceed the federal rate of basic pay set forth in the executive schedule promulgated by the U.S. Office of Personnel Management.
In May 2013, after notice and public comment, the Department of Health promulgated regulations to implement Executive Order No. 38 (see 10 NYCRR part 1002). The regulations set limits on “administrative expenses” and “executive compensation” for “covered providers,” and address waivers, reporting, and penalties for noncompliance. “Covered providers” include, among others, hospitals and nursing homes, home care services agencies, residential health care facilities, long term health care programs, AIDS care programs, hospices, assisted living residences, and emergency service entities that receive state funds or state-authorized payments above certain *598 thresholds (10 NYCRR 1002.1 [d] [3]). An entity is “covered” if, pursuant to an agreement with a state, county or local government to render program services, it receives state funds or state-authorized payments averaging in a two-year period more than $500,000 annually, and receives more than 30% of its total in-state revenues from state funds or state-authorized payments {id. § 1002.1 [d] [1], [2]).
Administrative Expenses Regulation
The regulation sets limits on the amount of administrative expenses that may be paid using state funds or state-authorized payments. The regulation defines “administrative expenses” as those expenses “incurred in connection with the covered provider’s overall management and necessary overhead that cannot be attributed directly to the provision of program services” (10 NYCRR 1002.1 [a]). They include the “portion of the salaries and benefits of staff performing administrative and coordination functions that cannot be attributed to particular program services,” such as the executive director or chief executive officer, financial officers, and accounting, public relations, information technology, and human resources personnel {id. § 1002.1 [a] [1] [i]). They also include legal expenses and office expenses that cannot be attributed directly to the provision of program services, such as the costs of telephone and computer systems, licenses and permits, office supplies, subscriptions and conferences, and insurance {id. § 1002.1 [a] [1] [ii], [iii]).
The regulation mandates that “[n]o less than 75 percent of the covered operating expenses of a covered provider paid for with State funds or State-authorized payments shall be program services expenses rather than administrative expenses” {id. § 1002.2 [a]). The percentage, which became effective for all covered providers on July 1, 2013, was required to be increased by 5% each year until it reached 85% in 2015 {id.).
Executive Compensation Regulations
The regulations impose two different limits on compensation for “covered executives.” The term “covered executive” includes “a compensated director, trustee, managing partner, or officer,” and “key employees” whose salary and/or benefits, in whole or in part are administrative expenses {id. § 1002.1 [b]). The definition confines “key employees” to the top 10 highest paid individuals, and excludes chairs, directors, and other clinical and program personnel in hospitals or other facilities that provide program services {id.).
The first limit on executive compensation is what petitioners term a “hard cap.” Absent a waiver, a covered provider “shall *599 not use State funds or State-authorized payments for executive compensation given directly or indirectly to a covered executive in an amount greater than $199,000 per annum” {id. § 1002.3 [a]). The Department of Health must review that hard cap amount annually and adjust it as necessary, subject to the approval of the Division of the Budget {id.). The “hard cap” applies only to the use of state funds or state-authorized payments for executive compensation.
The second limit on executive compensation, which goes further than the limit directed by the Executive Order, is what petitioners term a “soft cap.” The “soft cap” provision allows covered providers to pay covered executives more than $199,000 per annum from “not only State funds and State-authorized payments but also any other sources of funding,” but, absent a waiver, they may do so only under one of two circumstances {id. § 1002.3 [b]). First, the covered executive may be paid more than $199,000 from all sources if the amount is not “greater than the 75th percentile of that compensation provided to comparable executives in other providers of the same size and within the same program service sector and the same or comparable geographic area” based on a compensation survey recognized by the Division of the Budget {id. § 1002.3 [b] [1]). Second, the covered executive may be paid more than $199,000 from all sources if the amount has been reviewed and approved by the covered provider’s board of directors or equivalent governing body, “including at least two independent directors or voting members,” and such review includes an assessment of appropriate comparability data {id. § 1002.3 [b] [2]).
The effective date of the executive compensation limits was July 1, 2013, but contracts with covered providers that predated July 1, 2012, were grandfathered {id. § 1002.3 [h]). The limits are applicable to renewals of such contracts, as well as to preexisting contracts extending beyond April 1, 2015, unless the covered providers obtain a waiver {id.).
Waivers, Reporting, and Penalties
The regulations provide for waivers of the limits on executive compensation and administrative expenses upon a “showing of good cause,” and establish procedures for obtaining such waivers {id. § 1002.4). They also set forth the factors to be considered before granting or denying such waivers and provide that any waiver must be approved by both the Department of Health and the Division of the Budget {id.). The regulations establish reporting requirements to facilitate enforcement {id. *600 § 1002.5). And they establish procedures for determining noncompliance, an opportunity for corrective action, and penalties ranging from the redirection of funds to the suspension, modification, or termination of licenses or contracts to provide services {id. § 1002.6).
Petitioners’ Contentions
Petitioners in Matter of LeadingAge N.Y., Inc. v Shah (the LeadingAge petitioners) consist of “covered providers” and trade associations that collectively represent the interests of more than 1,000 not-for-profit and for-profit entities that provide care in long-term and skilled nursing facilities, senior housing facilities, and adult care and assisted living communities in this state. Petitioners in Matter of Coalition of N.Y. State Pub. Health Plans v New York State Dept, of Health (Coalition petitioners) consist of trade associations that represent the interests of many not-for-profit and for-profit health care and managed care plans in this state.
Both the LeadingAge petitioners and the Coalition petitioners claim that the Department of Health lacked authority to promulgate regulations limiting administrative costs and executive compensation, and that the regulations violate the separation of powers principles enunciated in Boreali v Axelrod (71 NY2d 1 [1987]). The LeadingAge petitioners argue further that the regulations governing executive compensation violate the “business judgment rule” and various New York statutes governing not-for-profit and for-profit businesses. And both sets of petitioners contend that the caps on executive compensation, the definition of covered providers, and particular waiver provisions are arbitrary and capricious.[1]
Analysis—Separation of Powers Claims
The New York State Department of Health has statutory authority to “regulate the financial assistance granted by the state in connection with all public health activities” (Public Health Law § 201 [o]), and to “expend funds made available for public health purposes pursuant to law” {id. § 201 [p]). The Department also has the authority to,
*601 “in the interest of the health of the people of the state [,] enter into such contracts or agreements ... as may be deemed necessary and advisable to carry out the general intent and purposes of the public health law . . . within the limit of funds available, for materials, equipment or services” (id. § 206 [3]).
It is further authorized to enter into contracts with not-for-profit entities to provide home care for the sick and disabled, and may establish fees charged for such services (id. § 206 [6]). The Department of Health is the “single state agency” charged by the legislature with supervising and implementing the Federal Medicaid Act (Public Health Law § 201 [1] [v]; see Social Services Law § 363-a). Despite the Department’s broad statutory authority to regulate funding for health care providers and to enter into contracts for the provision of services and care, petitioners contend that the limits on reimbursed administrative costs and executive compensation exceed that authority and intrude on the legislative prerogative.
The constitutional principle of separation of powers, implied by the separate grants of power to each of the coordinate branches of government, “ ‘requires that the [legislature make the critical policy decisions, while the executive branch’s responsibility is to implement those policies’ ” (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 609 [2015], quoting Bourquin v Cuomo, 85 NY2d 781, 784 [1995]). There need not be a specific and detailed legislative expression authorizing a particular executive act as long as “the basic policy decisions underlying the regulations have been made and articulated by the Legislature” (Bourquin, 85 NY2d at 785 [internal quotation marks and citation omitted]). “[I]t is only when the Executive acts inconsistently with the Legislature, or usurps its prerogatives, that the doctrine of separation is violated” (Bourquin, 85 NY2d at 785 [internal quotation marks and citation omitted]).
The Appellate Division recently summarized the factors to be considered in analyzing a Boreali challenge:
“[W]hen determining whether an administrative agency has violated the constitutional principle of separation of powers, [the Court] must consider the ‘coalescing circumstances’ set forth in Boreali v Axelrod, namely, (1) whether the respondents improperly engaged in the balancing of their stated *602 goal with competing social concerns and acted solely on [their] own ideas of sound public policy; (2) whether the respondents engaged in the interstitial rulemaking typical of administrative agencies or instead wrote on a clean slate, creating [their] own comprehensive set of rules without benefit of legislative guidance; (3) whether the challenged regulation concerns an area in which the Legislature ha[s] repeatedly tried—and failed—to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions; and (4) whether the respondents overstepped their bounds because the development of the regulation did not require the exercise of expertise or technical competence by the administrative agency” (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 125 AD3d 105, 108 [3d Dept 2014], lv denied 25 NY3d 963 [2015] [internal quotation marks and citations omitted]; see Boreali, 71 NY2d at 12-14; Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 692-693, 696-701 [2014]).
In determining whether the difficult-to-define line between administrative rulemaking and legislative policy-making has been transgressed, the “Court should view these circumstances in combination, while ever mindful that it is the province of the people’s elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends” (Matter of NYC C.L.A.S.H., Inc., 125 AD3d at 108 [internal quotation marks and citations omitted]).
Applying the four Boreali considerations here, the court concludes that the Department of Health did not usurp the legislature’s prerogative by establishing caps on administrative costs and executive compensation that will be reimbursed by state funds or state-authorized funds. The court concludes, however, that the Department of Health overstepped its statutory authority by setting a “soft cap” on executive salaries paid from all sources and defining the criteria and decision-making processes that must be applied before corporate entities may exceed the “soft cap.”
*603 Limits on Administrative Costs and Executive Compensation Reimbursed by State Funds or State-Authorized Funds
Considering the first Boreali factor, the court finds no indication that respondents improperly balanced economic and social concerns against their stated goal of focusing taxpayers’ dollars on expenses incurred in the delivery of services and care to the needy. The Department of Health’s statutory responsibilities include an obligation to ensure the efficient use of taxpayers’ dollars in funding and contracting for the delivery of health care and services (see Matter of Koch v Sheehan, 21 NY3d 697, 700 [2013]). The Department routinely promulgates regulations setting reimbursement rates for the myriad of services and care funded by governmental programs. Thus, the court rejects petitioners’ assertion that respondents gave improper consideration to economic concerns; this is not the kind of improper balancing proscribed in Boreali (see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, 23 NY3d at 697-698). Nor is the regulation “laden with exceptions based solely upon economic and social concerns” (Boreali, 71 NY2d at 11-12). All aspects of the limitations on expenses to be reimbursed by state funding or state-authorized funding are well-grounded in the respondents’ stated purpose—to spend a greater portion of government funding on direct care and services—a goal that is entirely consistent with its statutory goals to administer these funding programs efficiently for the promotion of the public health.
Considering the second Boreali factor, the court finds that the Department of Health did not write on a clean slate, but rather filled in the interstices of its statutory mandates. The legislature has given the Department of Health broad authority to regulate the financial assistance that the State provides for public health programs; to receive and expend monies made available for public health programs; to enter into contracts with entities to provide health care and services; and, perhaps most importantly here, to administer the medical assistance programs required by federal statute. While there may be no specific statutory delegation of authority directing respondents to establish caps on reimbursement for administrative costs and executive compensation, “[t]he Legislature is not required in its enactments to supply agencies with rigid marching orders” (Matter of NYC C.L.A.S.H., Inc., 125 AD3d at 110, quoting Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, 410 [1991]; accord Matter of New York Statewide *604 Coalition of Hispanic Chambers of Commerce, 23 NY3d at 700). The Department’s statutory mandate is clear: administer taxpayer funding programs efficiently to get the biggest bang for the buck in the delivery of health care and services. Thus the “basic policy decisions underlying the regulations have been made and articulated by the Legislature” (Bourquin, 85 NY2d at 785; see Matter of Koch, 21 NY3d at 700).
Considering the third Boreali factor, the Department of Health did not improperly intrude upon an area that is a matter of legislative debate. That the Governor, one day before he issued Executive Order No. 38, had submitted substantially the same limits on reimbursable administrative costs and executive compensation in his 2012 budget bill, which were not enacted, does not demonstrate that the issue was solely one of legislative prerogative. Petitioners also point to a 2012 Senate hearing and Report of the New York Senate’s Standing Committee on Investigations and Government Operations, and several legislative proposals addressing executive compensation for not-for-profit corporations. But the two Senate bills (2012 NY Senate Bill S6930; 2013 NY Senate Bill S5198) addressed only executive compensation, not administrative expenses overall; and neither was focused on entities participating in the state’s health care funding programs. Likewise, legislation enacted in June 2013, the Nonprofit Revitalization Act (L 2013, ch 549, § 58 [2013 NY Assembly Bill A8072]), addressed executive compensation for all not-for-profits by prohibiting persons benefitting from such compensation from being present or participating in voting or deliberations regarding such compensation. And although the cited Assembly Bill (2013 NY Assembly Bill A6616) proposed limits similar to those challenged here, neither the failed bills nor the 2013 legislation are enough to demonstrate that the issues addressed by the challenged executive order and regulations governing the use of funds paid to taxpayer-supported health care providers lay exclusively in the legislative province. The courts have recognized “the necessity of ‘some overlap between the three separate branches’ of government as well as the ‘great flexibility’ to be accorded the Governor [and his executive agencies] in determining the methods of enforcing legislative policy” (Bourquin, 85 NY2d at 785, quoting Clark v Cuomo, 66 NY2d 185, 189 [1985]). The circumstances here are unlike the repeated failed attempts at legislation, extensive lobbying, and vigorous public debate about social behavior that were *605 truncated by the Department’s preemptive promulgation of pervasive smoking regulations struck down in Boreali.
Finally, considering the fourth Boreali factor—whether the challenged regulation required the exercise of expertise or technical competence—raises some concern for the court, but does not in and of itself require a conclusion that respondents overstepped their bounds. The limits imposed here were not initiated by the Department of Health, but by the Governor through his executive order directing various agencies to promulgate regulations imposing these very limits after a task force conducted a statewide study of executive compensation for taxpayer-supported not-for-profits. Nevertheless, the Department of Health has extensive expertise in approving contracts and setting the parameters of reimbursement for providers of health care and services, toward the objective of making efficient use of limited governmental resources to fulfill its public health mandate. The Department brought to bear that expertise when it adopted the regulations, including not only the limits themselves but also the waiver, reporting, and penalty provisions, and it did so after receiving public comments about how such limits would affect participating providers.
Considering these factors in their totality, the court concludes that the regulations, to the extent they address administrative costs and executive compensation paid by state funds and state-authorized funds, do not violate the separation of powers doctrine (accord Concerned Home Care Providers, Inc. v New York State Dept. of Health, 45 Misc 3d 703 [Sup Ct, Suffolk County 2014] [appeal pending]; contra Agencies for Children’s Therapy Servs., Inc. v New York Dept. of Health, 2014 NY Slip Op 33692[U] [Sup Ct, Nassau County 2014] [appeal pending]).
The Soft Cap on Executive Compensation from All Sources
The court reaches a contrary conclusion after applying the Boreali factors to the “soft cap” provision, which imposes a limit on executive compensation paid from all sources except under certain circumstances. The “soft cap” provision was not included in Executive Order No. 38. It allows covered providers to pay covered executives more than $199,000 per annum from “not only State funds and State-authorized payments but also any other sources of funding” (10 NYCRR 1002.3 [b]). But absent a waiver, they may do so without penalty only if (1) the *606 amount of compensation is not “greater than the 75th percentile of that compensation provided to comparable executives in other providers of the same size and within the same program service sector and the same or comparable geographic area” based on a compensation survey recognized by the Division of the Budget; and (2) the amount has been reviewed and approved by the covered provider’s board of directors or equivalent governing body, “including at least two independent directors or voting members (or, where a duly authorized compensation committee including at least two independent directors or voting members conducted such review on behalf of the full board,” and “such actions were . . . reviewed and ratified by such board),” and such review included “an assessment of appropriate comparability data” (10 NYCRR 1002.3 [b]).
First, because the “soft cap” provision reaches beyond state funds and state-authorized funds expended for executive compensation, it flags concerns that the agency was improperly engaged in acting on its own ideas of good public policy. The connection between the Department’s stated objective of focusing taxpayer funds on direct care and services becomes more attenuated when it attempts to regulate executive compensation from all sources. The court acknowledges that money is fungible and that petitioners can choose not to enter into contracts that provide for reimbursement from public funds, but accepting respondents’ rationale would prove too much—it arguably would allow the Department to reach unduly into corporations’ prerogative to allocate assets and income from nongovernmental sources.
Second, given the attenuation between the “soft cap” and the Department’s mandate to manage the efficient and effective use of taxpayer funds for health care and services, the “soft cap” provision ventures outside the agency’s proper role of interstitial rulemaking. The need to control the compensation of executives in various types of corporations, particularly not-for-profit corporations, is increasingly the subject of debate. That debate involves weighing difficult public policy goals, and is not necessarily connected to the corporation’s reliance on taxpayer funding.
Indeed, the legislature has established comprehensive statutory schemes governing the discretion of the corporations’ *607 governing bodies to set executive compensation.[2] Not-for-Profit Corporation Law § 202 (a) (12) gives nonprofit corporations the power “to elect or appoint officers, employees and other agents of the corporation [and to] fix their reasonable compensation,” and provides that “[s]uch compensation shall be commensurate with services provided.” Similarly, Business Corporation Law § 202 (a) (10) gives for-profit corporations the power to “elect or appoint officers, employees and other agents of the corporation, define their duties, fix their compensation and the compensation of directors.” And Limited Liability Company Law § 202 (h) provides for the power to “elect or appoint managers, employees and agents of the limited liability company, define their duties and fix their compensation.” Furthermore, in 2013, the legislature enacted the Nonprofit Revitalization Act to eliminate self-dealing in setting executive compensation, regardless of whether the not-for-profit corporation receives taxpayer funding. Absent a direct connection with the agency’s obligation to oversee the expenditures of taxpayer funds for health care and services, and absent other specific statutory authority, the “soft cap” regulation appears to be in tension with the legislative choices reflected in these statutes giving corporations the power to set executive compensation.[3]
Finally, considering the fourth Boreali factor, the court is also concerned about the detailed regulatory conditions under which a corporation’s governing body may authorize executive compensation exceeding the soft cap from other sources. The *608 Department of Health has no special expertise or competence in administering regulations governing the overall compensation of corporate executives, nor has it special expertise or competence in regulating the procedural aspects of corporate governance. The “soft cap” regulation meddles significantly in the decision-making processes of corporations’ governing bodies, both substantively by setting the “75 percent” rule, and procedurally by defining the approval processes themselves.
These “coalescing circumstances” lead the court to conclude that the Department of Health’s promulgation of the “soft cap” regulation is not a proper exercise of its interstitial powers and intrudes on the legislative prerogative to make policy choices about overall executive compensation from sources beyond taxpayer funds (see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, 23 NY3d at 698 [striking down sugary drinks regulation because it involved value judgments and difficult and complex public policy choices “reserved to the legislative branch”]; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344 [1985] [executive agency may not use contracting powers to advance its own notions of good social policy]).
Analysis—Arbitrary and Capricious Claims
Both the LeadingAge petitioners and the Coalition petitioners contend that the limits on executive compensation are arbitrary and capricious, although the focus of their arguments is on the irrationality of the “soft cap” regulation, which the court has already found invalid. To the extent that the Leading-Age petitioners also contend that the limits on administrative costs and executive compensation reimbursable by taxpayer dollars are arbitrary and capricious, neither claim has merit.
The Department promulgated the limits on executive compensation set forth in Executive Order No. 38 after Governor Cuomo’s task force issued its report on executive and administrative compensation levels at not-for-profit corporations receiving taxpayer support through state-funded and state-administered funding programs. The task force included members involved in administering taxpayer-supported health care and services programs. In addition, the Department promulgated waiver provisions to alleviate undue impacts on covered providers, again reflecting the expertise of the agency in administering the Medicaid program and other governmental funding programs. It promulgated these regulations after the *609 opportunity of extensive public comment. Moreover, the regulations set forth administrative procedures for reviewing applications for waivers, followed by judicial review. Any claim that these provisions are being applied arbitrarily and capriciously can be addressed in an article 78 proceeding addressing a specific administrative interpretation. The court cannot find that, on their face, the regulations governing reimbursable executive compensation and administrative expenses are arbitrary and capricious.
The LeadingAge petitioners also argue that the definitional threshold for covered providers—those that receive more than 30% of their revenues from state-funded or state-administered funding programs—is arbitrary and capricious. But there is nothing unreasonable about that threshold on its face. It is not irrational for the Department to choose to apply these regulations, which clearly will require staff time and effort to implement, to those providers that receive a substantial percentage of their total New York revenues from taxpayer dollars.
Nor have petitioners demonstrated that it was irrational to exclude certain categories of medical providers. The regulations apply to a wide variety of health care and service providers, ranging from home care agencies, residential care facilities, assisted living facilities, ambulance services, health maintenance organizations, and other providers. The exclusion of government-run facilities, pharmacies, and medical supplies companies does not render the regulations arbitrary and capricious. Different pressures exist to control the expenditures of government-run facilities, and pharmacies and medical supplies companies do not ordinarily render direct care and services to patients.
The LeadingAge petitioners further contend that the regulations are arbitrary and capricious because they unfairly discriminate against and disadvantage providers who serve beneficiaries of state programs. But the whole point of the regulations is to target governmental funds to the disadvantaged beneficiaries the providers agree to serve. When entities choose to provide services to disadvantaged beneficiaries and to participate in governmental funding programs, they necessarily agree to limits on certain reimbursable expenses. While petitioners disagree with respondent’s policy choice and claim that the limits impose undue hardships on covered providers, the limits on executive compensation and administrative expenses reimbursed by state-funded or state-administered fund *610 ing programs cannot be held arbitrary and capricious merely because they apply only to those covered providers that receive substantial taxpayer dollars.
Finally, there is no meaningful way on this record for the court to evaluate petitioners’ facial claims that the excessive compensation and administrative cost regulations cannot be squared with current rate-setting methodologies and reconciliation processes. The same is true of the Coalition petitioners’ claim that the waiver provisions are arbitrary and capricious. The agency in the first instance must have the opportunity to apply the provisions in the context of a particular provider. Only then, when a record is made, can the court address such claims in an as-applied CPLR article 78 proceeding.
The court has examined petitioners’ remaining contentions and, to the extent not discussed above, finds them meritless.
Accordingly, the petitions are denied to the extent they challenge the regulations limiting use of state funds or state-authorized funds for administrative expenses and executive compensation (the “hard cap”), and the court declares that such regulations do not violate the doctrine of separation of powers and are not arbitrary and capricious. The petitions are granted to the extent they challenge the regulation limiting use of both state and non-state funds for executive compensation (the “soft cap”), and the court declares that the “soft cap” regulation was promulgated in excess of the Department of Health’s authority and therefore violated the separation of powers doctrine.

. The LeadingAge petitioners challenge Executive Order No. 38 as well as the regulations promulgated by the Department of Health. But because Executive Order No. 38 is not self-executing and is of no force and effect independent of the regulations, the challenge to the Executive Order is not jus-ticiable. Moreover, in its August 2014 order consolidating these cases, the court (Ceresia, J.) dismissed the LeadingAge petitioners’ substantive due process and federal preemption claims.

. Petitioners also argue that the regulations conflict with the “business judgment rule.” That rule prohibits judicial inquiry into the actions of corporate directors taken in good faith and in the exercise of honest judgment on the lawful and legitimate furtherance of corporate purposes (Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 537-538 [1990]). Although that concept may be embodied in the cited statutes, it provides no independent basis for the challenge here.

. These statutes do not preclude the agency from promulgating the regulations governing the administrative costs and executive compensation that are reimbursed by taxpayer funds. All three statutes contain language making corporate powers “subject to any limitations provided in . . . any other statute of this state” (N-PCL 202 [a]; Business Corporation Law § 202 [a]; Limited Liability Company Law § 202). In the court’s view, this language subjects the corporations’ general powers to more specific limitations imposed not only by other statutes, but also by regulations duly promulgated under other statutes. Because the court has concluded that the legislature authorized the Department of Health to establish limits on health care expenses paid for by state funds or state-authorized funds, the regulations pertaining to administrative costs and the “hard cap” on executive compensation are not in conflict with the statutes generally governing corporate powers.