Matter of LeadingAge N.Y., Inc. v Shah (2018 NY Slip Op 06965)

Matter of LeadingAge N.Y., Inc. v Shah

2018 NY Slip Op 06965 [32 NY3d 249]

October 18, 2018

DiFiore, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, January 30, 2019

[*1]

In the Matter of LeadingAge New York, Inc., et al., Appellants-Respondents,
v
Nirav Shah, as Commissioner of Health, et al., Respondents-Appellants. (Proceeding No. 1.)
In the Matter of Coalition of New York State Public Health Plans et al., Appellants-Respondents, 
 v New York State Department of Health et al., Respondents-Appellants. (Proceeding No. 2.)

Argued September 5, 2018; decided October 18, 2018

Matter of LeadingAge N.Y., Inc. v Shah, 153 AD3d 10, affirmed.

{**32 NY3d at 254} OPINION OF THE COURT

Chief Judge DiFiore.

This appeal involves a challenge, on separation of powers grounds, to regulations promulgated by the Department of Health (DOH) limiting executive compensation and administrative expenditures by certain health care providers receiving state funds. Because we agree that two of the challenged regulations fall within the agency's regulatory authority but that a third was promulgated in excess of its delegated powers, we affirm the order of the Appellate Division.
I.
After media reports emerged of high executive compensation within nonprofit health care organizations funded in part by Medicaid, Governor Cuomo created a task force to investigate the issue. In January 2012, the Governor issued Executive Order (Cuomo) No. 38 (EO38) to certain executive agency heads, including respondent Commissioner [*2]of Health, directing agencies providing state funding to service providers to regulate provider use of state funds for executive compensation and administrative costs, specifying that the agencies should (i) limit providers' allocation of state funds toward administrative costs to 15% by 2015 and (ii) "[t]o the extent practicable," limit reimbursement of the amount of state funds used for executive compensation by a provider to $199,000 (9 NYCRR 8.38). The executive order was aimed at "curb[ing] . . . abuses in executive compensation and administrative costs" within service providers receiving state funds in order to "ensure that taxpayer dollars are used first and foremost to help New Yorkers in need" (id.). DOH published proposed regulations that were consistent with EO38 and, after a public comment period and substantial revision, promulgated the regulations at issue in 2013 (see 10 NYCRR part 1002).
Consistent with EO38, the regulations impose restrictions on state-funded providers' expenditures related to administrative expenses and executive compensation. The restrictions apply to "covered providers," which the regulations define as those (i) receiving, pursuant to a contract with DOH (or another{**32 NY3d at 255} governmental entity or entity on its behalf) for program services, "State funds or State-authorized payments during the covered reporting period and the year prior . . . in an average annual amount greater than $500,000"; and (ii) "at least 30 percent of whose total annual in-state revenues for the covered reporting period and for the year prior . . . were from State funds or State-authorized payments" (10 NYCRR 1002.1 [d] [1], [2]). The regulations exempt certain entities and individuals from the definition of "covered provider," including state, county, and local governments and those "providing primarily or exclusively products, rather than services" in exchange for state funds (id. § 1002.1 [d] [6] [i], [iv]).
Two of the regulations have been labeled a "hard cap" (id. §§ 1002.2 [a]; 1002.3 [a]) and the third a "soft cap" (id. § 1002.3 [b]). The so-called hard cap has two components, one relating to administrative expenses and the other executive compensation. The administrative expenses hard cap mandates that "[n]o less than 75 percent [increasing to 85 percent by 2015] of the covered operating expenses of a covered provider paid for with State funds or State-authorized payments shall be program services expenses rather than administrative expenses," thus limiting the percentage that the provider may allocate to administrative expenses to 15% beginning in 2015 (id. § 1002.2 [a]). The executive compensation hard cap directs that, absent a waiver, a covered provider may "not use State funds . . . for executive compensation . . . in an amount greater than $199,000" (id. § 1002.3 [a]).
The "soft cap" regulation also relates to executive compensation. Under the soft cap, a covered provider is subject to penalties if executive compensation exceeds $199,000 per year from any source of funding (state or non-state), with two significant exceptions (id. § 1002.3 [b]). The soft cap is applicable only if the executive compensation either (i) is "greater than the 75th percentile of that compensation provided to comparable executives in other providers of the same size and within the same program service sector and the same or comparable geographic area as established by a compensation survey identified, provided, or recognized by the [DOH] and the Director of the Division of the Budget"; or (ii) "was not reviewed and approved by the covered provider's board of directors or equivalent governing body (if such a board or body exists) including at{**32 NY3d at 256} least two independent directors or voting members" (id. § 1002.3 [b] [1], [2]).[FN1]
Both executive compensation caps apply to compensation paid to a "covered executive," defined in the regulations as "a compensated director, trustee, managing partner, or officer," or "key employee" whose compensation exceeded $199,000 during the reporting period, "whose salary and/or benefits, in whole or in part, are administrative expenses" (id. § 1002.1 [b]).[FN2] The definition of "covered executive" expressly excludes "[c]linical and [*3]program personnel in a hospital or other entity providing program services, including . . . types of personnel fulfilling administrative functions that are nevertheless directly attributable to and comprise program services," like "chairs of departments" and "directors of nursing" (id.). "Program services" are those "rendered by a covered provider or its agent directly to and for the benefit of members of the public . . . that are paid for in whole or in part by State funds or State-authorized funds," with certain exceptions (id. § 1002.1 [h]).[FN3]
A covered provider may receive a waiver excusing compliance with the caps upon a showing of "good cause" (id. § 1002.4). With respect to the executive compensation caps, DOH outlined six factors for determining "good cause," including "the extent to which the covered provider would be unable{**32 NY3d at 257} to provide the program services reimbursed with State funds . . . at the same levels of quality and availability without obtaining reimbursement for executive compensation" in excess of the $199,000 limit (id. § 1002.4 [a] [2] [ii]).[FN4] DOH also identified five factors [*4]supporting a waiver from the administrative expenses hard cap, including "[e]vidence that a failure to reimburse specific administrative expenses that are the subject of the waiver would negatively affect the availability or quality of program services in the covered provider's geographic area" (id. § 1002.4 [b] [2] [ii]).[FN5]
These two hybrid CPLR article 78 proceedings and declaratory judgment actions were commenced by two sets of petitioners soon after the regulations were promulgated. The petitioners in Matter of LeadingAge N.Y., Inc. v Shah (the LeadingAge petitioners) are nursing homes, assisted-living programs, home-care agencies, and trade associations representing those types of providers. The petitioners in Matter of Coalition of N.Y. State Pub. Health Plans v New York State Dept. of Health—Coalition of New York State Public Health Plans, New York State Coalition of Managed Long Term Care/PACE Plans, and New York Health Plan Association, Inc. (the Coalition petitioners)—are trade associations representing health care plans, health maintenance organizations, and long-term care plans. Both groups have members who contract with DOH to provide health care services and receive significant state funds—primarily via Medicaid. Petitioners sought invalidation of the regulations, contending that in promulgating the regulations, DOH exceeded its regulatory authority and violated the separation of powers doctrine. Petitioners further asserted that the regulations are arbitrary and capricious. The LeadingAge petitioners also brought substantive due process and federal preemption claims.{**32 NY3d at 258}
After the actions were consolidated and the substantive due process and federal preemption claims dismissed, Supreme Court partially denied relief, declaring that the hard cap regulations do not violate the separation of powers doctrine and are not arbitrary and capricious but declaring the soft cap regulation to be invalid (56 Misc 3d 594 [Sup Ct, Albany County 2015]). Supreme Court reasoned that promulgation of the executive compensation and administrative expenses hard cap regulations did not usurp the legislature's role because they are grounded in the statutory mandate of "administer[ing] taxpayer fund[ed] programs efficiently to get the biggest bang for the buck in the delivery of health care and services" (56 Misc 3d at 604). Supreme Court also held that the hard cap regulations were not arbitrary and capricious, noting that the regulations were promulgated based on task force research and after public comment, and that the definitional thresholds, exclusions, and the decision to apply the regulations only to providers receiving state funding were not irrational (id. at 608-610). The court observed, however, that it would be possible to address certain arguments only in the context of a challenge from a particular provider to which DOH has applied the regulations (id. at 610). With regard to the soft cap provision, however, Supreme Court granted the petitions, declaring that the soft cap was promulgated in excess of DOH's authority and therefore violated the separation of powers doctrine because it "reaches beyond state funds and state-authorized funds expended for executive compensation," and thus "flags concerns that the agency was improperly engaged in acting on its own ideas of good public policy" (id. at 605-606).
On the parties' appeals and cross appeals, the Appellate Division affirmed, with one Justice dissenting in part (153 AD3d 10 [3d Dept 2017]). The Appellate Division largely agreed with Supreme Court's reasoning, holding that because "DOH has the statutory obligation to ensure that scarce taxpayer dollars are used efficiently and for the benefit of those who are the recipients of the services, and routinely promulgates regulations setting reimbursement rates for the government-funded care and services," promulgation of the hard cap regulations did not reflect an inherently legislative attempt to balance policy concerns beyond DOH's purview (id. at 20). The Appellate Division further concluded that petitioners' claim that the hard cap regulations were arbitrary and capricious was "utterly devoid of merit" because "[b]oth empirical evidence and {**32 NY3d at 259}sound agency judgment support the promulgation of [the regulations]" (id. at 25-26). With respect to the soft cap, the Appellate Division agreed that DOH exceeded its authority by "attempting to regulate executive compensation from all sources" (id. at 25). The partially dissenting Justice would have invalidated both the hard and soft cap regulations, reasoning that the enabling legislation does not [*5]authorize DOH to "control how providers spend earned revenues for past services," that DOH impermissibly sought to balance the legislative goal "against the interests of private businesses in administering their internal fiscal affairs" (id. at 29 [Mulvey, J., concurring in part and dissenting in part]), and that the regulations are arbitrary and capricious (id. at 31).
In this Court, both sets of petitioners argue that the hard and soft cap regulations related to executive compensation constitute an improper attempt to regulate matters beyond the scope of DOH's authority, as the statutes directed to DOH do not expressly address executive compensation, and that the doctrine of separation of powers has been violated because the agency engaged in legislative activity that exceeds its regulatory powers. Petitioners further challenge the regulations as arbitrary and capricious, asserting that they are insufficiently linked to the concerns they attempt to mitigate and incorporate arbitrary standards. The LeadingAge petitioners extend their challenge to the administrative expenses hard cap, contending that the regulations conflict with existing legislation. Petitioners also maintain that even if the legislature intended to empower DOH to regulate in this arena, such a delegation would be ultra vires and unenforceable because the legislation on which the agency relies fails to provide sufficient guidance to the agency.
II.
"The concept of the separation of powers is the bedrock of the system of government adopted by this State in establishing three coordinate and coequal branches of government, each charged with performing particular functions" (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 178 [2016] [internal quotation marks and citation omitted]). The principle "requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (Bourquin v Cuomo, 85 NY2d 781, 784 [1995] [citation omitted];{**32 NY3d at 260} see NY Const, art III, § 1; art IV, § 1). "Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator" (Matter of Campagna v Shaffer, 73 NY2d 237, 242 [1989]). Thus, a legislature may enact a general statute that reflects its policy choice and grants authority to an executive agency to adopt and enforce regulations that expand upon the statutory text by filling in details consistent with that enabling legislation (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]). If an agency promulgates a rule beyond the power it was granted by the legislature, it usurps the legislative role and violates the doctrine of separation of powers (Matter of NYC C.L.A.S.H., 27 NY3d at 178; Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 608 [2015]).
The separation of powers doctrine commands that the legislature make the primary policy decisions but does not require that the agency be given rigid marching orders (see Greater N.Y. Taxi Assn., 25 NY3d at 609). Administrative entities possess technical expertise and may be vested with considerable discretion to flesh out a policy broadly outlined by legislators. Thus, in promulgating regulations, an agency may rely on a general but comprehensive grant of regulatory authority. To be sure, a broad grant of authority is not a license to resolve—under the guise of regulation—matters of social or public policy reserved to legislative bodies (Boreali v Axelrod, 71 NY2d 1, 9 [1987]). But among the powers possessed by necessary implication, administrative agencies have flexibility in determining the best methods for pursuing objectives articulated by the legislature (Bourquin, 85 NY2d at 790-791). And because it is not always possible to draw a clear line between the functions of the legislative and executive branches, common sense must prevail when determining whether an agency acted within its grant of authority (Greater N.Y. Taxi Assn., 25 NY3d at 609).
In Boreali, we offered guidance for finding "the difficult-to-define line between administrative rule-making and legislative policy-making" (71 NY2d at 11). The following "coalescing circumstances" may inform the inquiry:
"whether (1) the agency did more than balanc[e] costs and benefits according to preexisting guidelines, but instead made value judgments entail[ing]{**32 NY3d at 261} difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the legislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the [*6]matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation[ ]" (Matter of NYC C.L.A.S.H., 27 NY3d at 179-180 [internal quotation marks and citations omitted]; Boreali, 71 NY2d at 12-14).[FN6] We have explained that these are not "criteria that should be rigidly applied in every case" but rather "overlapping, closely related factors" that, viewed together, may signal that an agency has exceeded its authority (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 696 [2014]; see Greater N.Y. Taxi Assn., 25 NY3d at 612). If we find that the agency has been empowered to regulate the matter in question and has not usurped the legislative prerogative, the separation of powers inquiry is at an end (see Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d 601 [2018]). Our role in this regard is not to question the efficacy or wisdom of the means chosen by the agency to accomplish the ends identified by the legislature. Rather, we determine only whether the agency acted within the scope of its authority.
III.
In this case, our analysis must begin with a review of the function of the agency whose actions are challenged. DOH is the state agency primarily responsible for public health. It{**32 NY3d at 262} administers state health care programs that provide public medical services to New Yorkers and manages state funds earmarked for public health, including Medicaid funds. In this regard, the Public Health Law authorizes DOH to "regulate the financial assistance granted by the state in connection with all public health activities" (§ 201 [1] [o]) and to "receive and expend funds made available for public health purposes pursuant to law" (§ 201 [1] [p]), in addition to numerous other public-health-related tasks.
Of critical relevance here, DOH has been granted broad authority to maintain New York's Medicaid program, which provides a significant portion of the public funds under DOH management, and to implement related regulations (Social Services Law § 363-a).
"We have recognized that the public must be assured that the funds which have been set aside (for providing medical services to the needy) will not be fraudulently diverted into the hands of an untrustworthy provider of services. To that end, the agency charged with the responsibility of administering the medicaid program has inherent authority to protect the quality and value of services rendered by providers in that program" (Matter of Medicon Diagnostic Labs. v Perales, 74 NY2d 539, 545 [1989] [internal quotation marks and citations omitted]; see Matter of Koch v Sheehan, 21 NY3d 697, 700 [2013]).
Moreover, the legislature has authorized DOH to contract with private companies for the provision of state-funded health care services to the public (Public Health Law § 206 [3]). Reading these enabling statutes together, it is evident that the legislature has delegated to DOH the authority to receive, manage, and expend state funds; oversee the Medicaid program and the funding it provides; and contract with private entities that receive state money—all with the goal of ensuring that the limited public funding available be directed as efficiently as possible toward high-quality services for New Yorkers in need (see Public Health Law §§ 201 [1] [o], [p]; 206 [3]; Social Services Law § 363-a).
[1] Here, with respect to the hard cap regulations—which regulate only the manner in which state health care funding is expended—we conclude that DOH did not exceed its authority. Applying the first Boreali factor, [*7]promulgation of the hard caps{**32 NY3d at 263} reflects a "balanc[ing] [of] costs and benefits according to preexisting guidelines" set by the legislature—not a new "value judgment" directed at resolution of a "social problem." The enabling statutes reflect the legislature's policy directive that DOH oversee the efficient expenditure of state health care funds to ensure high-quality services and provide guidance to DOH in implementing regulations consistent with that directive.[FN7] The hard cap regulations are thus directly tied to a specific goal dictated by the legislature—to efficiently direct state funds toward quality medical care for the public (see Garcia, 31 NY3d 601). The hard caps accomplish that goal by limiting the extent to which state funds may be used for non-service-related salaries or disproportionately large administrative budgets, thereby channeling state funds toward the direct provision of services. DOH rationally concluded that requiring that a high proportion of state funding be used directly for medical services will further the legislative goal of maximizing state resources for the purchase of high-quality care.
Petitioners assert that in electing to limit the use of state funds for executive compensation and administrative expenses, DOH made decisions not envisioned by the legislature regarding the best use of state funding earned by health care providers. As petitioners point out, there are no statutes specifically restricting the use of state funding for executive compensation or administrative expenses. However, as we recognized in Greater N.Y. Taxi, enabling legislation need not detail an agency's role. Indeed, it is commonly the function of the administrative agency to fill in the details and interstices in a policy that may have been broadly articulated by the legislative branch. For example, in Greater N.Y. Taxi, where the New York City Council granted the New York City Taxi & Limousine Commission broad authority to regulate the taxi industry, we held that this included by implication the authority to require the use of a particular vehicle as part of the agency's "Taxi of Tomorrow" initiative (25 NY3d at 609-610). We reached this conclusion even though there was no specific legislative{**32 NY3d at 264} authority for the agency's decision to partner with a specific motor vehicle manufacturer rather than adhere to its prior practice of adopting general conforming vehicle specifications. This is a corollary of the maxim that an agency may promulgate regulations not specifically directed by its enabling legislation as long as they are consistent with and intended to advance the legislature's broad policy choice (id. at 611). Here, as in Greater N.Y. Taxi, DOH has been granted general but comprehensive authority to regulate how state funds are expended in furtherance of the goals of maximizing efficiency and quality in the provision of health care services. This grant of authority is sufficient even though the enabling statutes do not specifically instruct DOH to focus on executive compensation or administrative expenses as the particular means to achieve that goal.[FN8]
Although petitioners argue otherwise, in allowing waivers and exemptions to the hard caps, DOH did not make impermissibly complex policy decisions beyond its health care mandate. Rather, it used its expertise and understanding of the practical realities of New York's health care industry to develop a multi-factored analysis to account for specific scenarios in which the regulation would undermine the legislative objectives. In determining whether to grant a waiver, DOH may consider a provider's inability under the executive compensation hard cap to provide services "at the same levels of quality and availability" (10 NYCRR 1002.4 [a] [2] [ii]) or whether application of the administrative expenses hard cap "would negatively affect the availability or quality of program services in the [*8]covered provider's geographic area" (id. § 1002.4 [b] [2] [ii]). Thus, DOH crafted waiver provisions that excuse application of the regulations in situations where an important aspect of the legislative goal—the provision of high-quality care—would be obstructed.
The waiver provisions here can be contrasted with the exception in Statewide Coalition, where we determined that a portion cap rule on sugary drinks developed by the New York City Board of Health was adopted in excess of administrative authority. The portion cap rule banned the sale of a sugary drink in a cup that could contain more than 16 fluid ounces, "making it inconvenient, but not impossible, to purchase more{**32 NY3d at 265} than 16 fluid ounces of a sugary beverage while dining at a food service establishment" (23 NY3d at 698). By using an indirect method of regulation—buyer inconvenience—and exempting smaller-sized sugary drinks from the ban, the agency "necessarily chose between ends, including public health, the economic consequences associated with restricting profits by beverage companies and vendors, tax implications for small business owners, and personal autonomy" (id.). The rule was structured in a manner that indicated a weighing of diverse social and economic policy interests falling significantly outside the agency's public health mandate. In contrast, here, instead of improperly weighing competing special interests against the public health goal, the waiver provisions of the hard cap regulations are designed to further the legislative goal. Thus, the hard cap regulations do not evince an administrative attempt to advance an unrelated policy out of step with the enabling legislation or to mitigate the impact of the agency's rule based on social or public policy concerns unrelated to its mandate. Rather, they indicate a balancing of costs and benefits directly tied to the efficient use of state funds and quality of care goals directed by the legislature.
With respect to the second Boreali factor, in promulgating the hard cap regulations, the agency did not "write on a clean slate" but acted pursuant to a preexisting directive. Read together, the Public Health Law and Social Services Law provisions cited by DOH form a statutory framework directing DOH to use state health care funds in the most efficient and effective manner possible—to ensure, as the Supreme Court put it, "the biggest bang for the buck" (LeadingAge N.Y., Inc. v Shah, 56 Misc 3d at 604). By implementing the hard cap regulations, which attempt to steer state funds away from administrative uses and thus increase the impact of those funds on quality of care, DOH complied with this directive. Therefore, DOH "filled in details of a broad policy" articulated by the legislature (Greater N.Y. Taxi, 25 NY3d at 611, citing Boreali, 71 NY2d at 13).
The third Boreali factor—which considers the extent to which the legislature has attempted but failed to reach agreement on the issue—does not support petitioners' claim that the hard cap regulations address a topic exclusively within the legislative domain. While bills have been introduced in the legislature relating to executive compensation caps, they never made it out of committee. Moreover, many of the bills relied on by{**32 NY3d at 266} petitioners did not relate specifically to state funding of executive compensation or public health spending, and many of them were not proposed until after the issuance of EO38. As petitioners point out, the most relevant legislative proposal advanced prior to the adoption of the regulations was a January 2012 budget bill introduced by the Governor virtually contemporaneously with the issuance of EO38, which the legislature declined to pass. However, a single unsuccessful proposal is not in the same class as the repeated unsuccessful legislative efforts we have deemed indicative of the type of broad public policy issue reserved exclusively to the legislature. And,
"[w]hile it may have been more desirable for the Legislature to have passed a statute . . . , the question whether the [executive branch] had the authority to [take the challenged action] is not one of preference but of constitutionality. It is not the role of this Court to dictate how public policy should be implemented, but only to state when and how the Constitution has been offended" (Bourquin, 85 NY2d at 788).
With respect to the fourth Boreali factor, it is apparent that DOH utilized "special expertise" in crafting the hard cap regulations. Although EO38 contained specific instructions regarding limits on executive compensation and administrative expenses, DOH drew upon its understanding of the realities of the health care industry to adopt detailed definitional, waiver, and exemption provisions tailored to that sector. For example, DOH exempted from the executive compensation caps certain quasi-administrative jobs it identified as inseparable from the direct provision of program services, like hospital department chairs (10 NYCRR 1002.1 [b]). Thus, DOH ensured that state funds would be available to support appropriate compensation for experienced and skilled physicians and other health care workers, thereby providing an incentive for covered providers to offer competitive salaries to those most directly involved in patient care.
In totality, following consideration of the Boreali factors, we are unconvinced that, in adopting the hard cap regulations, DOH exceeded its regulatory authority. The legislature expressed a policy goal—that state health care funds should be expended in the most efficient and effective manner to maximize the quality and availability of [*9]public care—and the hard cap regulations, which focus exclusively on the appropriate{**32 NY3d at 267} use of state funds, are directly tied to that goal without improperly subverting it in favor of unrelated public policy interests.[FN9] The Appellate Division correctly held that the hard cap regulations were a proper exercise of DOH's regulatory powers.
IV.
[2] Having rejected the separation of powers challenge to the hard cap regulations, we turn to petitioners' claims that the regulations are arbitrary and capricious. DOH points out that certain aspects of this claim may be premature and might better await a subsequent CPLR article 78 challenge brought by a provider disciplined for failing to comply with the regulations. To the extent petitioners mount a facial challenge to the hard cap regulations, they do not meet their "heavy burden" of establishing invalidity on this basis (see Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 227 [2017]). An administrative regulation stands as long as it "has a rational basis and is not unreasonable, arbitrary or capricious" (id. at 226). The task force's discovery of excessive executive compensation within the health care industry provided a rational basis for the hard caps, as did New York's rapid increase in health care spending, resulting in per capita Medicaid spending nearly twice the national average. We cannot say that it was irrational for DOH to promulgate regulations that direct public funds towards services and away from non-service-provider salaries and administrative overhead, as well as to permit waivers on a case-by-case basis when a covered provider establishes that higher executive compensation or administrative expenditures are necessary to deliver{**32 NY3d at 268} quality services to the public. Accordingly, petitioners' challenges to the hard cap regulations were properly rejected.
V.
[3] We now turn our attention to the soft cap regulation, which precludes health care providers from paying executive salaries over $199,000 regardless of funding source, absent the applicability of an exception or the grant of a waiver. The soft cap regulation stands in stark contrast to the hard cap regulations, which do not actually restrict the total amount or percentage of funding a covered provider uses on administrative expenses or executive compensation (they merely limit the amount of state funding used for such purposes). Although we do not doubt that DOH's intentions were to advance the same interests underlying the hard cap regulations, we conclude that the calculus differs significantly with respect to the soft cap because it is not focused on the direct regulation of state health care funding. With respect to the soft cap, the first two Boreali factors are the most instructive and lead us to conclude that DOH's attempt to regulate the expenditure of private—as opposed to state—funds represents an unauthorized excursion by DOH beyond the parameters set by the legislature.
Unlike the hard cap regulations, which regulate only how providers use public funding, the soft cap imposes an overall cap on executive compensation, regardless of the funding source. The soft cap thus pursues a policy [*10]consideration—limited executive compensation—that is not clearly connected to the objectives outlined by the legislature but represents a distinct "value judgment." By attempting to control how an entity uses its private funding, DOH has ventured beyond legislative directives relating to the efficient use of state funds and into the realm of broader public policy concerns. Put another way, the soft cap imposes a restriction on management of the health care industry that is not sufficiently tethered to the enabling legislation identified by DOH, which largely concerns the expenditure of state funding for public health care. In this regard, the agency "wrote on a clean slate."
We are not suggesting that the regulation is entirely unrelated to the legislative goal of increasing efficiency and quality of health care by covered providers. If a provider pays an excessive salary, even using private funds, DOH may have a legitimate concern that the entity is misdirecting resources away{**32 NY3d at 269} from uses that directly impact services, i.e., money spent on outsized executive compensation is money not spent attracting or retaining more experienced or talented physicians by paying higher salaries to those who provide services. However, any impact on the efficiency or quality or affordability of services purchased by state funds emanating from the use of private funding sources for "excessive" executive compensation is indirect. Absent a clearer legislative delegation of authority in this regard, DOH has not demonstrated a sufficient connection between the soft cap and its general grant of authority to ensure "the biggest bang for the buck" with respect to the expenditure of state funds. Rather, the connection between the legislative aims and the regulatory means is simply too attenuated.
Indeed, the exceptions to the soft cap reflect a choice between competing public policy interests, rather than mere implementation of the legislature's chosen goal relating to the efficient use of state funds. A salary above the cap is permitted if "reviewed and approved" by the provider's board or other equivalent governing body including at least two independent directors or voting members, as long as it does not exceed "the 75th percentile" limitation (10 NYCRR 1002.3 [b]). Unlike the waiver provisions, which consider whether a provider can maintain the same high-quality services if forced to comply with the regulations, the soft cap exceptions are not clearly related to any quality of care goal. The fact that the executive compensation in a particular case was approved by a board containing two independent directors in no way necessarily promotes efficiency or quality or affordability of patient care—and it is therefore difficult to discern any connection between it and the policy adopted by the legislature in the enabling legislation. The same is true of the exception predicated on a board's review of "appropriate comparability data" (id. § 1002.3 [b] [2]) in approving executive compensation because there is no requirement that the compensation scheme ultimately adopted bear any particular relationship to that data. Like the sugary drinks portion cap rule we reviewed in Statewide Coalition, it appears that the soft cap "embodie[s] a compromise that attempted to promote [the legislative goal] without significantly affecting the . . . industry," which "necessarily implie[s] a relative valuing of . . . ends" that "involved more {**32 NY3d at 270}than simply balancing costs and benefits according to preexisting guidelines" (23 NY3d at 698).[FN10]
DOH emphasizes that State Finance Law § 163 (2) (a) requires that services be purchased from "responsive and responsible offerers," and that state agencies should consider potential contractors' "financial ability, legal capacity, integrity, and past performance" when dispensing state funds (see State Finance Law § 163 [1] [c]). This is undoubtedly an important aspect of any contracting agency's mandate. However, the difficulty here is that DOH has not shown a connection between a provider's decision to use private funds to compensate its executive staff handsomely or even excessively and the absence of any of these essential contractor characteristics. That an entity [*11]may have sufficient surplus funds to pay what some might call an exorbitant salary is just as likely to demonstrate the presence of "financial ability" as it is to signal a lack thereof. The legislature has not found that generous compensation of executive staff necessarily reflects a lack of "integrity"—and such a conclusion is far from intuitive.[FN11] If the agency has in fact drawn that conclusion (and it is not clear that there was any such impetus for the regulation), this would only reinforce our view that the soft cap regulation embodies a "value judgment" or "public policy" determination that is beyond the agency's health care funding mandate.
Critically, no claim is made here that executive compensation was restricted because DOH has determined, on a programmatic level, that there is a relationship between high executive income and relaxation of safety standards or diminution of other quality controls leading to poor patient outcomes.{**32 NY3d at 271} Needless to say, DOH has the authority to regulate in areas having nothing to do with state health care funding and, when doing so, can undoubtedly require health care providers to take certain actions (which may well involve the expenditure of private funds) to ensure patient safety and to meet required levels of service quality. But DOH does not justify the soft cap regulation on this basis, focusing instead on its authority to regulate state health care contracting and funding.
Viewed in this light, the soft cap regulation cannot be said to here "fill in details of a broad policy." Rather than determining the best way to regulate toward the legislative goal identified in its enabling legislation (i.e., using state funds to purchase affordable, quality care) with respect to the soft cap DOH appears to have envisioned an additional goal of limiting executive compensation as a matter of public policy and regulated to that end. Thus, we agree with the conclusion of the courts below that the soft cap regulation was promulgated in excess of DOH's administrative authority.
Accordingly, the order of the Appellate Division should be affirmed, without costs.

[*12]Garcia, J. (dissenting in part).
I agree with the majority that 10 NYCRR part 1002 is constitutional to the extent it requires a portion of state funds be spent directly on program services rather than on administrative expenses. However, I believe the Department of Health (DOH) exceeded its constitutional authority and acted arbitrarily in promulgating both the soft and hard caps on executive compensation. Accordingly, I dissent in part.
I.
Executive Order (Cuomo) No. 38 (EO38), issued by the Governor in 2012, purportedly sought to curb "abuses involving public funds" by limiting the use of state monies for "excessive administrative costs and outsized compensation for . . . senior executives" (9 NYCRR 8.38). "[T]he commissioner of each Executive State agency that provides State financial assistance or State-authorized payments to providers of services," including the Commissioner of Health, was instructed to promulgate regulations, that, at a minimum, (1) limited allocation of state funds to administrative costs to 15% by 2015; and (2) prohibited the use of state funds for executive compensation in an amount greater than $199,000 per year (id.). This latter{**32 NY3d at 272} figure was based on the highest salary paid to an executive on the federal pay scale (id. § 8.38 [2] [b]; Matter of LeadingAge N.Y., Inc. v Shah, 153 AD3d 10, 14 [3d Dept 2017]).
In response to the Governor's order, DOH promulgated 10 NYCRR part 1002, placing restrictions on "covered providers" that derive over $500,000 from state funds and earn at least 30% of total annual in-state revenue from those funds for the covered reporting period and year prior (see 10 NYCRR 1002.1 [d]). Excluded from this definition, and the regulations' restrictions, are "[s]tate, county, and local governmental units in New York State, and tribal governments for the nine New York State recognized nations, and any subdivisions or subsidiaries of the foregoing entities" (id. § 1002.1 [d] [6] [i]).
The regulations track EO38 in requiring the same ratio of program service expenses and administrative expenses (see 9 NYCRR 8.38 [2] [a]; 10 NYCRR 1002.2 [a]). They also adopt the salary figure taken from the federal pay scale in denying state funds for executive compensation in an amount greater than $199,000 (10 NYCRR 1002.3 [a]). DOH added a provision, the so-called "soft cap," which subjects a covered provider to penalties if executive compensation exceeds $199,000 per year from any source (majority op at 
255-256).
Section 1002.1 defines "administrative expenses" as those expenses "incurred in connection with the covered provider's overall management and necessary overhead that cannot be attributed directly to the provision of program services," and includes the "portion of the salaries and benefits of staff performing administrative and coordination functions that cannot be attributed to particular program services" (10 NYCRR 1002.1 [a]).
II.
As the majority notes, the relevant statutes provide DOH with the authority 
and the responsibility to ensure "that the limited public funding available be 
directed as efficiently as possible toward high-quality services for New Yorkers 
in need" (majority op at 262; see Matter of Medicon Diagnostic Labs. v Perales, 74 NY2d 539, 545 [1989]; Public Health Law §§ 201 [1] [o], [p]; 206 [3]). As a means to that end, DOH chose to limit the amount of administrative expenses that may be reimbursed from public funds to ensure those funds are spent directly on program services. By limiting administrative expenses only where they divert state funds away from the actual provision{**32 NY3d at 273} of health care services, the regulation advances the goals set forth in the relevant statutes. As a result, I agree with the majority that the limit on administrative expenses is constitutional.
I also agree with the majority that DOH, in attempting to restrict a covered provider's use of private funds through the soft cap on executive compensation, "ventured beyond legislative directives relating to the efficient use of state funds and into the realm of broader public policy concerns" (majority op at 
268). A broad grant of authority is not a license to resolve matters of social or public policy reserved to legislative bodies (Boreali v Axelrod, 71 NY2d 1, 9 [1987]). For the same reasons, the hard cap on executive compensation should be struck down.
Although the majority combines the administrative expenses cap with the state funding limitation on executive compensation under the "hard cap" heading, each of those regulations must be considered individually. [*13]Indeed, the restrictions are found in separate regulatory provisions (10 NYCRR 1002.2 [limits on administrative expenses], 1002.3 [limits on executive compensation]). Once the administrative expenses cap passes muster, it becomes clear that the "hard cap" on salary has no effect on whether "limited public funding . . . [is] directed as efficiently as possible toward high-quality services for New Yorkers in need" (majority op at 
262).
Under the administrative expenses cap, a covered provider must spend at least 85% of funding on "program services expenses," rather than "administrative expenses" (10 NYCRR 1002.2 [a]). "Administrative expenses" include, by definition, "that portion of the salaries and benefits of staff performing administrative and coordination functions that cannot be attributed to particular program services, including but not limited to the executive director or chief executive officer, financial officers such as the chief financial officer" (id. § 1002.1 [a] [1] [i] [emphasis supplied]). Executive compensation is defined to include "all forms of cash and noncash payments or benefits given directly or indirectly to a covered executive, including but not limited to salary and wages, bonuses, dividends" (id. § 1002.1 [g] [emphasis supplied]). State funds cannot be used to pay a covered executive more than $199,000 (id. § 1002.3 [a]). Accordingly, once the administrative cap controls, the executive compensation cap has no effect on money spent on program services. For example, assume a covered provider is meeting and exceeding the expense ratio at 90% of state{**32 NY3d at 274} funds going directly to program services. But that same company, perhaps as a reward for achieving such performance, is paying a covered executive $249,000. That executive spends half of his or her time on program services and half on administrative expenses. As a result of the regulation, the company cuts $50,000 from the executive's compensation. That company is free to direct all of that "saved" money to administrative expenses, assuming it remains under the 15% administrative cap—effectively diverting state funds from program services. Put another way, as the Coalition of New York State Public Health Plans petitioners point out,
"because part 1002 requires a provider to attribute 85% of the funds or payments it receives from the State to provide DOH program services, DOH will receive no more or less such services if the provider chooses to use any portion of the remaining 15% allotted for administrative expenses to pay executives in excess of $199,000."
At a minimum, there is no mandate to direct any portion of what DOH considers "extravagant" compensation to program services and therefore no tie to "profligate and disproportionate spending on executive compensation unrelated to program services." The problem, of course, is that these provisions are neither complementary nor duplicative (see majority op at 
267 n 9). Quite the opposite: the effect of one by operation makes the effect of the second unlawful.
Nevertheless, DOH argues that "excessive executive compensation and administrative expenses will divert scarce state resources away from the needy New Yorkers who are the intended beneficiaries of such funding." But the hard cap on compensation does not require that any additional funds be used for program services—it is not concerned with directing money toward "needy New Yorkers" but away from "overcompensated" executives. This is precisely the type of social policymaking prohibited by this Court's prior decisions (see Matter of Campagna v Shaffer, 73 NY2d 237, 242-243 [1989]; Council for Owner Occupied Hous. v Abrams, 72 NY2d 553, 558 [1988]; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 359 [1985]; Subcontractors Trade Assn. v Koch, 62 NY2d 422, 428 [1984]; Matter of{**32 NY3d at 275} Fullilove v Beame, 48 NY2d 376, 379 [1979]; Matter of Broidrick v Lindsay, 39 NY2d 641, 646-647 [1976]).[FN*]
This is not a new rule. In Boreali, we concluded that the agency had "stretched [the] statute beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be" (71 NY2d at 9). And we prefaced our discussion of the four "coalescing circumstances" by noting that the analysis of those factors would "persuade us that the difficult-to-define line between administrative rule-making and legislative policy-making has been transgressed" (id. at 11). Indeed, prior to Boreali, we noted that "the general power to enter into contracts which is bestowed upon the executive branch of government ordinarily cannot serve as a basis for creating a remedial plan for which the executive never received a grant of legislative power" (Subcontractors Trade Assn., 62 NY2d at 428; see also Under 21, Catholic Home Bur. for Dependent Children, 65 NY2d at 359 ["(A)n executive may not usurp the legislative function by enacting social policies not adopted by the Legislature"]). It was not conflict with the authorizing legislation that doomed the executive policymaking in those cases, but rather an unlawful assumption of power by the executive in setting that policy (see Under 21, Catholic Home Bur. for Dependent Children, 65 NY2d at 358).
Although the majority characterizes the hard cap as a permissible "balancing of costs and benefits" (majority op at 
265), the decision to cap executive compensation is a policy choice made by DOH from competing views of a hotly debated topic (compare Richard A. Posner, Are American CEOs Overpaid, and, if So, What if Anything Should be Done About it?, 58 Duke LJ 1013, 1045 [2009] ["Placing a ceiling on CEO salaries and other compensation would be a mistake. Apart from the infeasibility of a government agency's determining the amount of water in an executive's pay, capping salaries by government fiat, like other regulatory price controls, would incite wasteful activities that would be more costly to society than overcompensation"], {**32 NY3d at 276}with Charles C. Pak, Toward Reasonable Executive Compensation: Outcry for Reform and Regulatory Response, 1994 Ann Surv Am L 633, 659 [1995] ["The simplest response to excessive executive compensation would be to prohibit remuneration above a predetermined level or to impose a penalty for pay in excess of a specified level"]). This debate gained momentum following the 2008 financial crisis (see e.g. William O. Fisher, To Thine Own CEO Be True: Tailoring CEO Compensation to Individual Personality and Circumstances, 2017 Colum Bus L Rev 599 [2017]; Steven A. Bank et al., Executive Pay: What Worked?, 42 J Corp L 59 [2016]; Robert E. Wagner, Mission Impossible: A Legislative Solution for Excessive Executive Compensation, 45 Conn L Rev 549 [2012]; Stuart Lazar, The Unreasonable Case for a Reasonable Compensation Standard in the Public Company Context: Why It Is Unreasonable to Insist on Reasonableness, 59 Buff L Rev 937 [2011]; Omari Scott Simmons, Taking the Blue Pill: The Imponderable Impact of Executive Compensation Reform, 62 SMU L Rev 299 [2009]).
A policy choice about reasonable executive compensation aimed at influencing corporate behavior is law-making beyond DOH's regulatory authority (see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 698-699 [2014] [the regulation "evidenced a policy choice relating to the question of the extent to which government may legitimately influence citizens' decision-making . . . . By choosing between public policy ends in these ways, the Board of Health engaged in law-making beyond its regulatory authority"]). DOH's legislative authority related to fiscal oversight cannot justify these regulations. We have made clear that "[e]ven under the broadest and most open-ended of statutory mandates, an administrative agency may not use its authority as a license to correct whatever societal evils it perceives" (Boreali, 71 NY2d at 9). No agency, through regulation, can "effect its vision of societal policy choices" (Matter of New York State Health Facilities Assn. v Axelrod, 77 NY2d 340, 346 [1991]). DOH, with its caps on compensation that have no effect on money directed to program services, has done just that.
III.
In addition to its constitutional infirmity, the hard cap is arbitrary and capricious. As noted above, DOH fails to demonstrate how the hard cap will ensure that public funds are{**32 NY3d at 277} directed to program services rather than any other form of administrative expenses. Further, the benchmark for determining "excessive" compensation is itself arbitrary and capricious. The $199,000 cap was not the result of any compensation study of the health care industry, but instead was lifted from EO38, which for unknown reasons identified the highest salary paid to federal employees at Level I of the Executive Schedule as the benchmark for "outsized" executive compensation for all "providers of services" (see 9 NYCRR 8.38). The majority posits that the "research" conducted by the Governor's task force, convened to investigate nonprofit spending, provides "a rational basis for the hard caps" (majority op at 
258, 267). However, as noted [*14]in the record, the task force never produced any report supportive of a $199,000 cap (see testimony of Doug Sauer, Chief Executive Officer, New York Council of Nonprofits, Inc., Feb. 6, 2012, at 3 ["The Governor's Executive Order later established a $199,000 threshold presumably based on the recent survey. The data compiled in this survey still has not been publically released. I do not know where the $199,000 figure came from"]). The majority's statement that "[t]he task force's discovery of excessive executive compensation within the health care industry provided a rational basis for the hard caps" (majority op at 
267) is likewise unsupported by any citation or authority.
In an attempt to rationalize the caps on executive compensation, DOH argued: "[i]f a provider spends extravagantly on executive compensation—even out of private funds—it may be a red flag that the provider will spend state funds irresponsibly as well" (emphasis supplied). Yet, the regulation exempts certain entities from the cap, including state health care providers (10 NYCRR 1002.1 [d] [6] [i]). As noted in the testimony before the Senate Committee on Investigations and Government Operations, state executives earn upwards of seven figure salaries (see Sauer at 3). It is unclear why salaries greater than $199,000 for executives of state-run providers would not raise any "red flags." Moreover, the "caps have not been demonstrated through 'rational, documented, empirical determination' to have any connection to reducing state health care expenditures or to the more efficient use of taxpayer funds in the delivery of services" (LeadingAge, 153 AD3d at 31 [Mulvey, J., concurring in part and dissenting in part], citing New York State Assn. of Counties v Axelrod, 78 NY2d 158, 168 [1991]).{**32 NY3d at 278}
We have never before allowed an agency, by way of the power of the purse, to direct social policy (see Campagna, 73 NY2d at 242-243; Council for Owner Occupied Hous., 72 NY2d at 558; Under 21, Catholic Home Bur. for Dependent Children, 65 NY2d at 359; Subcontractors Trade Assn., 62 NY2d at 428; Matter of Fullilove, 48 NY2d at 379; Matter of Broidrick, 39 NY2d at 646-647). Under the majority's rule, the executive is now able to do so through the contracting authority of the State. Whoever the executive, whatever the policy, regulation is permissible if implemented under the guise of oversight of public funds—or "getting the biggest bang for the buck" to use the majority's phrase—regardless of whether the regulations do in fact further fiscal responsibility.

Dissenting opinion by Wilson, J. 
Wilson, J. (dissenting in part).
Four days after taking office as New York's first Governor, George Clinton contracted with a private entity to provide state services. Governor Clinton engaged Colonel Wynkoop to assist in raising the state militia against the British forces to the north. Wynkoop was hired, Clinton explained, for his "well known zeal for [his] Country[;] [his] Abilities as an Officer Knowledg[able] of Service" and was instructed to "keep a[n] [account] of the Expenses accruing on this Command that the same may be satisfied you together with your Pay" (George Clinton, No. 669, Instructions to Colo. Wynkoop, dated Aug. 2, 1777, 2 Public Papers of George Clinton 166 [1900]).[FN1]
Governor Clinton was not one to take the separation of powers lightly: his inaugural address to the legislature dwelt on the 1777 Constitution's "marking the line between the Executive, Legislative, and Judicial powers;"[FN2] he called upon each of the branches of government to "remain within the several departments in which the constitution has placed us, and{**32 NY3d at 279} thereby preserve the same inviolate," promising that it "shall always be my strenuous endeavor, on the one hand, to retain and exercise for the advantage of the people, the powers with which they have invested me; on the other, carefully to avoid the invasion of those rights which the constitution has placed in other persons" (George Clinton, No. 752, Governor's Address to the Legislature, dated Sept. 10, 1777, 2 Public Papers of George Clinton 297, 300 [1900]).
I dredge up this history to highlight just how far we have drifted from our Constitution's text and history in today's decision, a decision applying the unique four-factor separation of powers test laid out in Boreali v Axelrod (71 NY2d 1, 9 [1987]) to one of the most fundamental components of "the executive power": the choice of which private persons will receive state funding to provide public services. Boreali's separation of powers analysis has been followed by no other jurisdiction, and for good reason: it is unhelpful in cases to which it applies, and this is not even one of those cases.
Today, ostensibly following Boreali, the majority holds that the Constitution renders one part of a regulation valid but another, virtually identical, part of the same regulation invalid. Worse still, the majority performs this strange regulatory surgery to an executive order on a subject that has been part of the executive power since the dawn of an independent New York: selecting vendors to provide government services to execute the legislature's command, implicit in every appropriation, of giving the State "the biggest bang for the buck" (Matter of LeadingAge N.Y., Inc. v Shah, 56 Misc 3d 594, 604 [Sup Ct, Albany County 2015]). The present Governor, like his 1777 predecessor, seeks by the regulation at issue in this case "to retain and exercise for the advantage of the people, the powers with which they have invested me." By misapplying our dubious Boreali framework to a wholly inapplicable circumstance, we have deprived him of that power.
I agree with most of the majority's exposition of the background of the case. I also agree that the "hard" cap does not violate the separation of powers doctrine. However, I do not agree with the majority that the soft cap is [*15]invalid, or that Boreali applies to this case. Indeed, it is difficult to even articulate my disagreement with the majority on the "soft" cap using the Boreali framework, because Boreali has become so encumbered with imprecise and inaccurate verbiage that it no longer provides a useful framework even for disagreement. Judge Bellacosa,{**32 NY3d at 280} dissenting in Boreali, warned that Boreali's "dramatic[ ] change[ ]" to "the principles of ordinary statutory construction . . . will come back to haunt us" (71 NY2d at 19). It has.
I.
Even on its own terms, Boreali does not apply to this case. Boreali is invoked when the Court applies limiting constructions to statutes that, read literally, would give the executive branch unconstitutionally excessive power. Here, both the majority's opinion and much of the parties' arguments boil down to a non-constitutional question: is the challenged executive action (here a regulation) authorized by the cited statutes? That question cannot trigger a Boreali analysis, or we would apply Boreali to every statutory interpretation case to which the government is a party.[FN3] This very session, we considered whether the Department of Labor's executive actions (there, a letter explaining the considerations governing enforcement actions the Department might undertake at public construction sites) were consistent with its enabling statute, and no one mentioned Boreali (International Union of Painters & Allied Trades, Dist. Council No. 4 v New York State Dept. of Labor, 32 NY3d 198 [2018]).
I am not even sure the majority believes Boreali applies here. After dutifully walking through the Boreali factors to uphold the hard cap, the majority largely abandons Boreali thereafter. Its soft cap analysis contains not one peep about the Boreali factors except for the bald statement that "the first two Boreali factors are the most instructive" and a cryptic footnote declaring Boreali factor four is "at best . . . neutral" (majority op at 
{**32 NY3d at 281}268, 270 n 10).[FN4] Factor three is [*16]AWOL. Instead, the majority accuses the Department of Health (DOH) of embracing policy considerations "not clearly connected to the objectives outlined by the legislature" (majority op at 
268), because the soft cap "imposes a restriction . . . not sufficiently tethered to the enabling legislation" (id.). Even if that accusation were well-founded, it is not connected to concerns about separation of powers but rather the run-of-the-mill question of whether an agency's actions are contrary to law—the same question we ask in most agency-related cases we hear.
Boreali was never intended to be the touchstone for any challenge to the lawfulness of any executive action. It originated from a quite different problem than the one the majority identifies, namely ambiguous statutes with the potential to be read as engaging in a forbidden "delegation" of the legislative power to the executive by adopting laws empowering the executive with insufficient particularity.[FN5] In those circumstances, we held in Boreali and its progeny, the canon of constitutional avoidance requires us to select a narrower construction of the statute—perhaps even artificially narrow (see generally Matter of Jacob, 86 NY2d 651, 680 [1995, Bellacosa, J., dissenting])—to avoid declaring the legislation unconstitutional. Thus, in Boreali, the State's Public Health Council (PHC) acted pursuant to Public Health Law § 225 (5) (a), which permitted it to promulgate a sanitary code that "may . . . deal with any matters affecting the security of life or health or the preservation{**32 NY3d at 282} and improvement of public health in the state of New York." Recognizing that this grant, read literally, could permit the PHC to regulate essentially every aspect of life, the Court explained that "[h]owever facially broad, a legislative grant of authority must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits" (71 NY2d at 9). We held that the anti-smoking regulations, even if authorized by one construction of the statute in question, would not be permitted by the construction of the statute necessary to save the statute from constitutional doubt.
Here, the majority never claims that the relevant statutes would authorize the hard or soft cap but for the separation of powers problem. Instead, the majority explains that the statutes in this case grant "to DOH the authority to [among other things] contract with private entities that receive state money—all with the goal of ensuring that the limited public funding available be directed as efficiently as possible towards high-quality services for New Yorkers in need" (majority op at 
262). The majority tacitly recognizes that the authorization by the legislature cannot be plausibly interpreted to create a nondelegation problem: the statutes, read together, obey our command in Packer Coll. Inst. v University of State of N.Y. that the legislature must, in enacting any law that the executive is called upon to execute, "set bounds to the field, and . . . formulate the standards which shall govern the exercise of [executive] discretion within the field" (298 NY 184, 189 [1948]). So Boreali is irrelevant: what matters, at least in the eyes of [*17]the majority, is whether the legislature authorized the caps. That is the standard, day-in, day-out judicial question of whether the executive followed the law.
In a situation where we must narrow a statute to meet non-delegation requirements, Boreali was intended to provide some guidance as to how narrowly the statute ought to be read. To detach Boreali's factors from that role of statutory construction, and instead apply them alfresco to the regulations themselves, is to rob them of the context that might give them a chance of coherence. "The tendency of a principle to expand itself to the limit of its logic may be counteracted by the tendency to confine itself within the limits of its history" (Benjamin Cardozo, The Nature of the Judicial Process 51 [1922]). If we do not exile Boreali, we should make sure its cage is small.{**32 NY3d at 283}
II.
A.
Exile may be the better course. The trouble with Boreali's four "coalescing circumstances" is that they are stated at such a high level of generality as to be functionally in permanent flux. Even if they could be stated with precision, they are "not mandatory, need not be weighed evenly, and are essentially guidelines" (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 612 [2015]). Any doctrine so fluid will have difficulty providing either a meaningful constraint on executive power or sensible guidance for the courts. Although the parties do not ask us to reconsider Boreali, today's case illustrates why the Boreali doctrine "while longstanding, warrants serious reconsideration" (cf. People v Cummings, 31 NY3d 204, 213 [2018, Rivera, J., concurring]).
Consider the majority's analysis of Boreali factor three: whether the legislature has "unsuccessfully tried to reach agreement on the issue" (Greater N.Y. Taxi Assn., 25 NY3d at 611), which we have previously measured by examining legislative measures that were introduced but failed.[FN6] That factor is omitted entirely from the majority's discussion of the soft cap, and is adorned with a novel exception in the majority's discussion of the hard cap. "[S]ome 40 bills" on the subject of smoking weighed against the regulations at issue in Boreali (71 NY2d at 7), but the failure of six City Council resolutions and five bills in the legislature was enough to weigh against the regulations in Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene (23 NY3d 681, 692-693, 700 [2014], citing 110 AD3d 1, 14-15 [1st Dept 2013]). Here, the majority instructs us to disregard all such introduced bills unless they "made it out of committee"; it seems that only if a bill succeeds in committee{**32 NY3d at 284} but fails later in the legislative process can it count as an "unsuccessful legislative effort[ ]" (majority op at 
265-266). That's new. The Constitution nowhere mentions the committees of the legislature except in connection with the executive budget, which is not at issue in this case (NY Const, art VII, §§ 1, 3). Now, it seems, a committee chairperson can change the lawfulness of an executive act by arranging for proposed legislation to precipitate out of committee—at least until we engraft some other qualifications.[FN7]
Or consider the majority's treatment of Boreali factor four, the agency expertise factor. The DOH has just as much expertise on the appropriate salary level for persons employed by health care providers regardless of whether the source of the salaries is taxpayer dollars (the hard cap) or elsewhere (the soft cap). Indeed, the majority cites DOH's expertise in "the health care industry," reflected in crafting the waivers to the hard cap, as supporting its constitutionality. However, it then performs an about-face and declares that while DOH is expert in "the health care industry," because the soft cap exceptions are a "policy choice" (and the waiver is not?) the expertise factor is now, for unexplained reasons, "neutral." Because DOH could recreate the blanket soft cap exception by applying the case-by-case waiver universally, the majority leaves us with the unsupportable conclusion that an expert agency that makes policy choices in one way, ceases to be expert when it makes the same choices, even with the same ultimate result, another way—or, more likely, that the expertise factor is wholly irrelevant in the majority's decision.
Inconsistencies like the above have plagued our Boreali jurisprudence. In Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv. (27 NY3d 174, 182 [2016]), a challenge to the New York State Office of Parks, Recreation and Historic Preservation's approval of anti-smoking regulations in public parks, we held that even though the agency knew little about smoking, it was an expert in the "operation" of a park and thus all things within the park were{**32 NY3d at 285} within the agency's expertise (27 NY3d 174, 185 [2016]). Yet in Greater N.Y. Taxi Assn., we held the expertise factor was neutral—while the Taxi Commission had formidable expertise on taxi designs, having dictated them minutely for decades, it was not expert on the question of whether the selection ought to be limited to one model (25 NY3d 600, 612 [2015]). The pièce de résistance is our abandonment of factor four in Statewide Coalition, "[i]n light of Boreali's central theme" (23 NY3d at 700-701).
Our present and past inability to address the "expertise" factor stems from a confusion between statutory and administrative law analyses, in which agency expertise is relevant, and constitutional law, where it is not. Thus, when discussing DOH's expertise, what I believe the majority is trying to get at—and what Boreali has hopelessly muddled—is that the legislature is precise about which agency gets to exercise which power, and so legislation empowering the Secretary of State to prohibit blockbusting, for example, should not be read as empowering the Department of Economic Development from doing the same thing (cf. Matter of Campagna v Shaffer, 73 NY2d 237, 242 [1989] ["Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator"]).[FN8] Expertise also matters for the arbitrary-and-capriciousness analysis in administrative law, CPLR 7803 (3), because inexpert agency action is likely to lack a "foundation in fact . . . [and] sound basis in reason" (cf. Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]).
However, as a matter of constitutional law, we have already held that the Governor need not be an expert on a given subject to issue a valid executive order on that subject, when his orders are directed to officers who serve at his pleasure (Rapp v Carey, 44 NY2d 157, 165 [1978]). Because everyone acknowledges that this DOH regulation, including the $199,000 figure, came directly from the Governor (majority op at 
254), DOH's application of its expertise here does not affect the constitutional analysis, unless the majority is prepared to reverse Bourquin v Cuomo (85 [*18]NY2d 781, 786 [1995]) and{**32 NY3d at 286} Clark v Cuomo (66 NY2d 185, 189 [1985]), in which the Governor relied on no expertise but his own in creating new administrative bodies to supplement the agencies created by the legislature (and, in Clark, the Constitution itself).
The Governor, in issuing the order, was acting according to his duty to execute the laws—specifically, the laws regarding the control and supervision of expenditure of public funds, and the laws empowering him to pick and choose (according to certain legislatively-prescribed criteria) which health care providers would be beneficiaries of public funds. "[T]he executive power," after all, is vested in him and not the Commissioner of Health. It would be bizarre, as a constitutional matter, to hold that an order of DOH is a lawful exercise of the executive power but the Governor's is not because DOH is more expert than the Governor. Mired in the Boreali muck, the majority can only reach its chosen conclusion in the face of these inconvenient constitutional facts by jumping outside the Boreali factors, stating that the real problem is that the exceptions "appear to reflect a policy choice" by the agency outside of that authorized by the legislature. I disagree that DOH has done so here. That aside, to say experts employed by the State do not make policy choices is simply incorrect; to say they should not make policy choices is folly. Why should the State have experts at agencies if this Court forbids them from making decisions within their field of expertise that constitute "policy"?
On the subject of policymaking, consider the majority's treatment of the first Boreali factor, whether "the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems" (NYC C.L.A.S.H., 27 NY3d at 179-180 [internal quotation marks and brackets omitted]). As we said in Statewide Coalition, "the promulgation of regulations necessarily involves an analysis of societal costs and benefits" (23 NY3d at 697). In reality, there is only a difference of rhetoric between "balancing costs and benefits" and "difficult . . . choices," between "preexisting guidelines" and "broad policy goals" (at least in terms of most enabling legislation, which sets out guidelines in broad terms), and thus Boreali allows courts to uphold or void regulations entirely by dialing up or down their characterization thereof.
The majority's treatment of the "soft" and "hard" cap exceptions exhibits this tension. The majority claims that the{**32 NY3d at 287} Department "did not make impermissibly complex policy decisions" in adopting the hard cap by pointing to the Department's specialized knowledge "of New York's health care industry to develop a multi-factored analysis" (majority op at 
264) in designing the waiver provisions of the challenged rule. One of the waiver factors is "the extent to which the executive compensation that is the subject of the waiver is comparable to that given to comparable executives" (10 NYCRR 1002.4 [a] [2] [i]). Apparently this waiver factor either did not spring from a policy choice (majority op at 
265), or did so permissibly because it involved agency expertise. However, the same consideration, made more concrete in the soft cap's automatic waiver for salaries outside the 75th percentile of comparable executives (10 NYCRR 1002.3 [b] [1]), is deemed as an impermissible policy choice (majority op at 
268). Boreali thus leads the majority to hold that we must strike down as unconstitutional a regulation that says a provider salary cannot be greater than that of comparable executives—but uphold a regulation that says a provider salary cannot be greater than $199,000. Why is the selection of the 75th percentile exclusion less valid than a direct cap on salaries, at least under Boreali? The majority does not say.
Finally, I note that the majority does not explain how it weighs those Boreali factors it chose to consider. What began as "coalescing circumstances" morphed into considerations that "are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power" (Greater N.Y. Taxi Assn., 25 NY3d at 612), and are now measured according to some new and unknowable formula applied by the majority in today's opinion: the soft cap pursues a policy consideration contemplated by the legislature (factor one)—but "the connection between the legislative aims and the regulatory means is simply too attenuated" (majority op at 
269). Exactly what Boreali factor(s) this corresponds to the majority never makes clear. Is the agency writing on a blank slate (factor two)? Surely not, if a hard salary cap is sufficiently "interstitial." Perhaps the agency made "value judgments entailing difficult and complex choices between broad policy goals to resolve social problems," but the hard and soft caps both do that. The majority invalidates the soft cap without regard to the Boreali factors at all, except for a throwaway line that the first two Boreali factors are "most instructive" and a lonely footnote describing factor four as "neutral."
[*19]
{**32 NY3d at 288}This case aside, examples of the vagaries of Boreali could easily fill a volume of the New York Reports, and, indeed, they have (see e.g. Statewide Coalition, 23 NY3d at 715 [Read, J., dissenting] [recapitulating the many infirmities of Boreali]). Boreali aimed to protect liberty through a vigorous policing of the separation of powers, but "[l]iberty finds no refuge in a jurisprudence of doubt" (Planned Parenthood of Southeastern Pa. v Casey, 505 US 833, 844 [1992]). Boreali has proliferated confusion, confusion the majority today amplifies by applying Boreali outside of its intended ambit. If nothing else, the majority's opinion powerfully demonstrates that Boreali "leads to an unworkable rule, [and] . . . creates more questions than it resolves" (People v Taylor, 9 NY3d 129, 149 [2007]) such that it "no longer . . . withstands the cold light of logic and experience" (Policano v Herbert, 7 NY3d 588, 604 [2006] [internal quotation marks omitted]).
B.
Judge Garcia wisely does not apply the Boreali framework in his concurring and dissenting opinion. (Whether we agree about the infirmities of Boreali, he and I agree that the hard and soft caps stand or fall together.) Instead, he proposes a simpler test, which he argues can be derived from our pre- and post-Boreali decisions: if a regulation is "social policymaking" then it is "an unlawful assumption of power by the executive in setting that policy" and must be struck down (Garcia, J., dissenting op at 
274-275).
While that test benefits from concise exposition, I do not think it is workable or consistent with our law. Every act of the Governor or any executive branch agency is a balancing act between different societal interests. Indeed, the legislature wisely forbade major, binding executive actions in the form of regulations without notice and comment (see State Administrative Procedure Act § 202), precisely so those interests could be weighed. That is why the DOH solicited, and took seriously, the comments of industry and others in crafting the regulations at issue here—particularly, as the legislature directed, their impact upon employment, small businesses, and rural areas (State Administrative Procedure Act §§ 201-a, 202-b, 202-bb).
It is also why both the majority and Judge Garcia cite no authority, other than our own cases going back only to the 1970s and a bare citation to the executive or legislative vesting{**32 NY3d at 289} clauses of the Constitution, for the proposition that "policy" is the exclusive domain of the legislature. This Court's past jeremiads against a governor's advancement of his policy goals through his executive actions are oddly justified, even though the results reached in those cases may have been correct.[FN9] Governors are elected in part because of their expressed policy preferences. It would be peculiar to hold that the Constitution obliges a governor, once elected, to abandon those goals altogether. Instead, voters expect governors to pursue their stated policies with the caveat that those policies must yield, when governors are exercising the power to "expedite . . . the laws" (NY Const, art IV, § 3) to the policies of the laws they are called upon to "expedite."
A better view of the cases Judge Garcia cites for his "no policymaking" position (Garcia, J., dissenting op at 
275) is to say that while the executive may consider and advance its own policy goals in executing the laws, it may not execute the laws in a manner, or with a result, objectively inconsistent with the policy goals articulated, expressly or implicitly, in the legislation that purportedly authorizes that action. Thus in Matter of Campagna v Shaffer (73 NY2d 237, 245 [1989]), for example, we invalidated an effort by the executive to enforce an anti-blockbusting law by banning, wholesale, real estate agent solicitations on a certain part of the Bronx. It was not the policy-making activity of the executive that [*20]rendered the ban unlawful, but the inconsistency between the ban and the legislation that purportedly authorized it; legislation that "explicitly enumerated the types of solicitation it views as forbidden blockbusting activity" (id. at 243) which necessarily implied that the legislature intended for solicitation—but only the non-discriminatory kinds of solicitation—to continue. In Subcontractors Trade Assn. v Koch (62 NY2d 422, 427 [1984]), it was likewise not the executive's policy-making activities (there, creating a quota for the allocation of city contracts flowing from a mayoral policy of promoting small businesses) that rendered its actions ultra vires, but the lack of congruity between{**32 NY3d at 290} those actions and the governing legislation (General Municipal Law § 103) which, as the Appellate Division noted in that case (96 AD2d 774, 775 [1st Dept 1983]), required a competitive bidding process that looked only to "best value," defined by State Finance Law § 163—a statute that plays an important role in this case. The problem, in sum, in past cases where we invalidated acts of "contracting" was and is not that policymaking was happening through that contracting activity. It was rather whether the policies the executive made were congruent with the policies encoded in law—for when executive policy and legislative policy conflict, it is the legislative policy that governs.
III.
The constitutional question in this case, then, concerns the limits of "[t]he executive power" (NY Const, art IV, § 1). The Governor, and those persons exercising power as gubernatorial appointees, possesses the power and duty to "expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws are faithfully executed" (NY Const, art IV, § 3). This is a part, indeed the principal part, of "[t]he executive power" vested in the office (NY Const, art IV, § 1). The question in this case is solely whether the Governor, and his appointed commissioner, exceeded that "executive power" by promulgating 10 NYCRR part 1002.
The "executive power" has been vested in the governor from the first Constitution of New York State, adopted in 1777, in which the governor was vested with "the supreme executive power" (1777 NY Const art XVII), and obliged "to take care that the laws are faithfully executed to the best of his ability; and to expedite all such measures as may be resolved upon by the Legislature" (1777 NY Const art XIX), wording that has essentially survived until the present day.[FN10] It descends directly {**32 NY3d at 291}from the colonial governors, and to them from the British Crown. The framers of the 1777 Constitution, and the early 19th century constitutions where the executive power clauses assumed the forms they have today, would have been most familiar with Blackstone's formulation of what the law-execution power entailed:
"For, though the making of laws is entirely the work of a distinct part, the legislative branch, of the sovereign power, yet the manner, time, and circumstances of putting those laws in execution must frequently be left to the discretion of the executive magistrate. And therefore his constitutions or edicts, concerning these points, which we call proclamations, are binding upon the subject, where they do not either contradict the old laws, or tend to establish new ones; but only enforce the execution of such laws as are already in being, in such manner as the king shall judge necessary." (1 William Blackstone, Commentaries on the Laws of England at 261 [1755] [emphasis added].)[*21]
In his exercise of the power and duty to "expedite all such measures as may be resolved by the legislature," or "putting those laws in execution," per Blackstone, the governor and his commissioners are called on to do three sets of tasks routinely: hire people, spend money appropriated by the legislature and, oftentimes in a large and complex government administration like New York's, regulate how those people the governor hired spend the money appropriated by the legislature. Indeed, in describing the federal executive power as congruent with the powers of the Governor of New York under the 1777 State Constitution, Alexander Hamilton described the "executive details" of the "administration of government" as including "the preparatory plans of finance . . . [and] the application and disbursement of the public moneys in conformity to the general appropriations of the legislature" (Hamilton, Federalist No. 72).
The power to spend money appropriated by the legislature is at the very core of the power to execute the laws, and at the heart of the power to spend money is the power to contract. Suppose, for example, that the legislature, worried about New{**32 NY3d at 292} York's growing cheese surplus,[FN11] appropriated $10 million "for services and expenses of a program, to be established by the Agriculture and Markets Commissioner, to increase the consumption of cheese in the State." The executive branch must spend that money, as we held in Matter of County of Oneida v Berle (49 NY2d 515, 523-524 [1980] [no executive branch power to "impound" lawful appropriations]), but the only way it can do so is by contracting, whether that be contracting for employment, or for some other services. Contracting, in turn, is impossible unless the executive branch can select amongst contractors based on its own conception, bounded of course by relevant legislation, of how one might best increase cheese consumption given the $10 million appropriated. When it comes to "expedit[ing] all such measures as may be resolved upon by the legislature," and the measure in question is about spending public money, it's contracts all the way down.
The executive branch's power to contract is not unlimited, because the executive power is not unlimited. The executive cannot contract except as authorized by law. If the law forbade the making of a certain contract, or forbade choosing contractors on a certain basis, the executive could not make that contract or one substantially at odds with what the legislature forbade. As Blackstone explained, executive actions were effective only "where they do not either contradict the old laws, or tend to establish new ones; but only enforce the execution of such laws as are already in being."[FN12] Those laws must, we have held in connection with cases concerning the legislative power (NY Const, art III, § 1), be sufficiently definite so as to allow assessment of whether the governor or commissioner is enforcing "the execution of such laws as already in being"; the legislature must "set bounds to the field, and . . . formulate the standards which shall govern the exercise of [executive]{**32 NY3d at 293} discretion within the field" (Packer Coll., 298 NY at 189). The executive cannot contract except to execute the existing laws made by the legislature, which necessarily means the executive cannot use the contracting power to "establish new ones."
[*22]
We can see this principle in operation, if not in description, in Under 21, Catholic Home Bur. for Dependent Children v City of New York (65 NY2d 344 [1985]). There, we held that a regulation issued by the Mayor of New York banning discriminatory employment practices on the part of contractors exceeded the Mayor's executive power, because it attempted to achieve a policy goal not contemplated in the relevant legislation from which the contracting itself sprang. However, we noted, if the executive "feels that the price of a particular contract is too high due to a contractor's employment policies, it is of course free to choose some other contractor" (Under 21, 65 NY2d at 359 n 5 [emphasis added]). In other words, because the authorizing legislation set bounds to the field—the executive could pick and choose contractors, but only on certain bases, like price—the executive was free to select an indicia of prices, there discrimination in employment, and pick and choose contractors on that basis as an indicia of price. (And doing so would of course be informed by policy—a policy judgment that the State gets better deals from non-discriminatory contractors.) But in Under 21, the Mayor was plainly not doing this; rather, he was considering a factor outside the bounds of the legislation from which the contracting power sprang. That, we held, was impermissible (accord Subcontractors Trade Assn. v Koch, 62 NY2d 422, 427 [1984]; Matter of Fullilove v Carey, 48 NY2d 826 [1979]; Matter of Fullilove v Beame, 48 NY2d 376 [1979]; Matter of Broidrick v Lindsay, 39 NY2d 641 [1976]).
Once we understand the constitutional question is whether the regulation exceeds the executive power, the analysis is simpler. As discussed above, the executive power, including the power to contract, exists in reference to existing legislation. Thus, to determine the lawfulness of executive action, we must determine whether it objectively advances the policy goals articulated in the legislation that purportedly authorizes that action. If those goals are undiscernible then the legislation is itself unconstitutional under the nondelegation doctrine as outlined in Packer Coll. (298 NY at 189). If the legislation is susceptible of an interpretation that articulates determinate policy goals and another that does not (the original Boreali question), then it must be interpreted to be sufficiently{**32 NY3d at 294} determinate to have the policy goals against which an executive action can be judged.
This far simpler framework is, in fact, largely consistent with our existing jurisprudence in outcome if not in form.[FN13] It is also consistent with the majority's decision on the hard cap. The majority concludes, correctly, that the [*23]hard cap regulations advance the legislature's policy goal "that state health care funds should be expended in the most efficient and effective manner possible to maximize the quality and availability of public [health] care" (majority op at 
266-267). Where the majority founders, however, is in its refusal to pursue that principle when it turns to the soft cap.
IV.
To understand why the "soft cap" is constitutional, it is helpful to explain what the soft cap is doing and the precise statutory goals it is attempting to advance: preventing circumvention of the hard cap, and advising providers that the State may deem them undesirable or inefficient vendors and allocate taxpayer monies away from them and to competitors whom, in the State's judgment, provide superior value.{**32 NY3d at 295}
A.
Much of the majority's analysis of the soft cap turns on its application to private as well as public funds (see e.g. majority op at 
268). But any effective regulation involving the use of public funds by private providers needs to take private funds into account. Recall that the hard cap puts a ceiling of $199,000 on the executive compensation certain covered employees can receive from state coffers (10 NYCRR 1002.3 [a]). Many private health care providers do not receive all their revenues from the State. Instead, they treat some patients for whom the State reimburses them, and some patients that pay directly out of pocket or are covered by private health insurance.
Suppose you were a covered executive at such a provider and were facing the hard cap only. You want to pay yourself a salary of $1,000,000. The State says if you use more than $199,000 of the state monies you receive to pay your salary (leaving aside waiver for the moment), the State may cease doing business with you and turn to other providers. So you simply adjust your organization's budget: from here on out, you will get a salary up to the cap from state dollars, but use private dollars to get to the $1,000,000 figure. Perhaps you will not even report that as salary, but as a perquisite of college tuition for your children, use of an automobile, country club membership, etc., funded entirely by private monies (see Russ Buettner, Reaping Millions in Nonprofit Care for Disabled, NY Times, Aug. 2, 2011, https://www.nytimes.com/2011/08/02/nyregion/for-executives-at-group-homes-generous-pay-and-little-oversight.html). Of course, that $801,000 is coming from somewhere—either from private funds paying salaries of other employees or other needed administrative expenses or, of course, patient services for which the State is paying, freeing up the private funding to go to salaries, thus indirectly costing the taxpayers more money in the long run.
All of this circumvents the central goal of the regulation, and the goal which the Members of this Court unanimously agree was written into the authorizing statute: to maximize the "bang for the buck" the State receives when it chooses among service providers (cf. Matter of Medicon Diagnostic Labs. v Perales, 74 NY2d 539, 545-546 [1989] [understanding the relevant statutes to mean that "the agency charged with the responsibility of administering the medicaid program has inherent authority to protect the quality and value of services rendered by providers in that program"]). It is both rational and appropriate for DOH{**32 NY3d at 296} to attempt to ensure that the providers with which it contracts invest in certain administrative expenses (say, a functioning patient portal that allows for more convenient and efficient appointments with doctors) rather than others (compensation for executives), so as to maximize the impact of the state dollars spent on direct service provision.
Circumvention of the hard cap is possible because money is fungible, regardless of its source. Once the State has paid a provider, as a practical matter the only way the State can ensure it is being spent properly is to directly [*24]order those spending any money to spend any of their money on some things and not others (and, I stress, we unanimously agree such an order is appropriate in this case, as regards "administrative" versus "direct services" caps). And even if the soft cap were a belt-and-suspenders provision, and the hard cap can stand on its own, "that a regulatory provision may be duplicative or . . . unnecessary in relation to the achievement of the legislative goal does not make it ultra vires" (majority op at 
267 n 9).
Understood in this way, the soft cap suffers from none of the infirmities that the majority suggests it possesses. It is not pursuing a policy consideration "not clearly connected" from the objectives outlined by the legislature; it is pursuing the exact same policy consideration as the hard cap—maximizing the impact and power of every state dollar reaching a provider—to avoid circumvention of the hard cap. In tandem, the caps maximize the benefit received by the State while ensuring the private health care provider sector would not circumvent the regulations. Circumvention, whether unscrupulous, negligent, or inadvertent, was surely possible: the most recent annual report for the Medicaid Inspector General (Office of the Medicaid Inspector General, 2016 Annual Report, https://omig.ny.gov/images/stories/annual_report/2016_OMIG_Annual_Report.pdf, cached at 
http://www.nycourts.gov/reporter/webdocs/2016OMIGAnnualReport.pdf) reveals $418 million in Medicaid recoveries and $1.9 billion in cost-avoidance initiatives, all responding to a combination of bad practices and simple error at the hands of private health care providers.
Accordingly, just as the hard cap objectively advanced the legislatively-circumscribed goal of getting the "biggest bang for the buck" in its Medicaid services, the soft cap, which is really{**32 NY3d at 297} just an anticircumvention provision, does the same.[FN14] Indeed, the majority concedes this very point in its opinion when it explains that "DOH's intentions were to advance the same interests underlying the hard cap regulations" (majority op at 
268). If DOH's "choices" are the critical question here, as the majority would have us believe, then its "intentions" should determine the result, because DOH's policy choice was consistent with the legislature's grant.
B.
Even if the soft cap were pursuing a different policy consideration than the hard cap, it would still be well within the confines of the executive power because it objectively advances another legislatively-decreed policy: ensuring the State does business only with responsible contractors. State Finance Law § 163 (2) (a) declares it the policy of the State to "promote purchasing from responsive and responsible offerers," defined in part to require that the State examine those offerers' "financial ability, legal capacity, integrity, and past performance" (State Finance Law § 163 [1] [c]).[FN15] It objectively advances the legislature's demand that the State do business only with those persons with "financial ability, legal capacity . . . [and] integrity" for the executive to require that those it does business with pay salaries that are reasonable, as measured by the oldest standard of reasonableness there is—what everyone else (or at least the 75th percentile of everyone) is doing. It also objectively advances that goal to insist that the nonprofits to which the State will entrust over $150 billion in taxpayer dollars be governed responsibly, with independent or at least attentive boards of directors. Between the centrality of contracting to the basic functioning of the executive, the clarity of the legislative policy command, and the close connection of this regulation to those goals, the soft cap falls squarely within the executive power and is thus constitutional.
The majority concedes that State Finance Law § 163 is "an important aspect of any contracting agency's mandate" but {**32 NY3d at 298}holds the soft cap is still unconstitutional because DOH "has not shown a connection between a provider's decision to use private funds to compensate its executive staff handsomely or even excessively" and the "absence of any of these essential contractor characteristics" (majority op at 
270). There are at least three problems with this contention.
[*25]
First, it is wrong as a matter of fact. DOH explained in some detail, both in the briefing of this case and in its discussion of the regulation in the record, exactly why payment of excessive compensation from private sources was a "red flag" indicating the provider's fiscal responsibility and integrity as those terms have been long understood in the public procurement process.
Second, the majority that just told us that administrative agencies "may be vested with considerable discretion to flesh out a policy broadly outlined by legislators . . . [and] have flexibility in determining the best methods for pursuing objectives articulated by the legislature" (majority op at 
260) now says that an agency cannot determine the best methods of pursuing the broad (but certainly not unbounded) objectives of State Finance Law § 163 based on its admitted expertise. That flies in the face of elementary principles of administrative law, the same elementary principles the majority vaunts just a few pages into its own opinion.
Third, the majority misquotes State Finance Law § 163 by omitting a key phrase: the various essential contractor characteristics, the legislature tells us, are defined in accordance with how "such terms have been interpreted relative to public procurements" (State Finance Law § 163 [1] [c]). Who conducts public procurements? The executive. By what goals? These are well established in State Finance Law § 163 itself, and include, among other things, the command that "[i]t shall be the responsibility of the head of each state agency to periodically sample the results of the procurement process to [among other things] ensure that the results withstand public scrutiny" (State Finance Law § 163 [11] [emphasis added]). Surely it was reasonable to conclude that the "results" of the pre-soft cap contracting rules, which allowed the State to plow millions of dollars into nonprofits that were paying their own executives lavish compensation, would not "withstand public scrutiny." Thus DOH's view that State Finance Law § 163 required it to look, among many other factors, at the governance of a potential contractor and the salaries it pays its top executives before giving them taxpayer dollars is simply obedience to a{**32 NY3d at 299} different mandate, a general contractor mandate, as applicable to DOH as any part of the Public Health Law.
The two exceptions in the soft cap illustrate exactly how the soft cap allowed the agency to test the "responsibility" of a given contractor. First, relying on its understanding of the health care sector, DOH concluded that the surest guide of "legal capacity" and "integrity" in an organization is good governance practices—and certainly not executives setting their own salaries without any review. Hence, DOH required that salaries more than the $199,000 benchmark from any source be reviewed by a board, and that it either contain independent directors or at least assess "appropriate comparability data" in signing off on that decision (10 NYCRR 1002.3 [b] [2]). The point of requiring an examination of comparability data was to invoke a provider's own governance structures to encourage efficiency and responsibility, not secure a particular dollar figure salary as the majority supposes (majority op at 
269). Second, if a contractor decided not to implement these very basic integrity-based reforms, DOH created an exemption for salaries that were 75% of the norm for the provider and the region (10 NYCRR 1002.3 [b] [1]), which would allow it to concentrate its limited enforcement resources on only the "red flag" actors that DOH might choose to avoid when deciding how to spend taxpayer dollars.
Finally, the majority's analysis of State Finance Law § 163 raises as many questions as it answers. The parties, as well as the majority, do not appear to object to the many and varied ways in which DOH measures "integrity" in its regular contractor accreditation process set out in 18 NYCRR 504.1 et seq., such as not doing business with entities that make false statements to licensure agencies (18 NYCRR § 504.5 [a] [4]). Surely DOH's identification of lying to a licensure agency as an "integrity" factor is as much a "value judgment" (majority op at 
270) as its finding in 10 NYCRR 1002.3 that "excessive compensation," minus certain safeguards, is a sign of "irresponsibility"? The majority cannot mean what it says—that DOH's determinations about the integrity of contractors are illegitimate "value judgments" beyond the agency's "health care funding mandate." Were that so, it would cripple DOH's ability to regulate fraud and malfeasance. Decertifying, or refusing to deal in the first place with, contractors who lack "integrity" is indeed a "public policy determination," but it is one that the legislature has expressly told the executive branch to make for{**32 NY3d at 300} over a century. Unless discounted as throwaway dicta, the majority's statement places the entirety of 18 NYCRR part 504, in which DOH requires that only "qualified and responsible persons may be enrolled as providers of care, services, and supplies" (and to which no parties object) (18 NYCRR 504.1 [a]), in serious constitutional doubt.
[*26]
This would be a different case, of course, if the legislature had not specified "responsibility" as a permissible criteria by which the Department could pick and choose amongst vendors and had declared other criteria to be the exclusive basis on which the executive could make that choice. But the legislature decreed "responsibility" as a criterion, and DOH is appropriately expediting the matter resolved by the legislature. One way to look at it is that, everything else equal, the State would prefer to contract with providers who use private funds to improve common goods from which state-funded patients can benefit, rather than those providers who pay their executives lavishly. This is perfectly proper behavior on the State's part—just as a construction contractor might be preferred because it owns equipment, financed by a private job but useful for a public building site, or has a skilled workforce that gains experience on private jobs.
C.
Even if State Finance Law § 163 did not give the agency authority to select only responsible contractors to participate in Medicaid and related programs, the appropriations themselves give rise to the executive power to select (consistent with other laws and parts of the Constitution, of course) from competing contractors to spend that money. The executive has had the power to select among contractors since the dawn of an independent New York, provided the selection is made in a manner consistent with the laws or appropriations giving rise to the creation of the contract (basic authority to do so, the majority correctly notes, was vested in the Department by Public Health Law § 206). Inherent in an appropriation are two considerations the executive may lawfully consider: the quality of the service provided, and the cost of that service. Here, once the legislature appropriated money for private providers to give public services, the executive was free to determine that it would direct that money to entities that were frugal and not spendthrift, because doing so objectively advanced the legislatively-circumscribed policy goal of the appropriation—to {**32 NY3d at 301}take the least amount of taxes and generate, if you will, the most amount of health care.
Thus, hard or soft, the regulation at issue here was entirely constitutional. Accordingly, I would uphold the regulation in its entirety.
In each case: Order affirmed, without costs.
Opinion by Chief Judge DiFiore. Judges Stein, Fahey and Feinman concur; Judge Garcia dissents in part and votes to modify in favor of petitioners in accordance with an opinion; Judge Wilson dissents in part and votes to modify in favor of respondents in accordance with an opinion; Judge Rivera dissents in part and votes to modify in favor of respondents for the reasons stated in parts I, III and IV of Judge Wilson's opinion.

Footnotes

Footnote 1:Under this exception, the soft cap also applies "where a duly authorized compensation committee including at least two independent directors or voting members conducted such review on behalf of the full board" and "such actions were not reviewed and ratified by such board," or where the board, governing body, or committee's "review did not include an assessment of appropriate comparability data." (id. § 1002.3 [b] [2]).

Footnote 2:"Administrative expenses," as referenced in both the administrative expenses hard cap and the definition of "covered executive," are "those expenses authorized and allowable pursuant to applicable agency regulations, contracts or other rules that govern reimbursement with State funds or State-authorized payments that are incurred in connection with the covered provider's overall management and necessary overhead that cannot be attributed directly to the provision of program services" (id. § 1002.1 [a]).

Footnote 3:Covered providers are required to report their compliance with these regulations for each "covered reporting period" by filing a disclosure form (id. § 1002.5 [a]), and the regulations contain penalties for noncompliance (see id. § 1002.6). When DOH determines that a covered provider is not in compliance with the regulations, it must afford the provider six months (which may be extended) to achieve compliance pursuant to a "corrective action plan" approved by DOH (id. § 1002.6 [b]-[c]). Thereafter, DOH may: (i) "[r]edirect[ ] . . . State funds or State-authorized payments to be used to provide program services"; (ii) suspend, modify or terminate contracts with that provider; or (iii) revoke the provider's license to deliver DOH program services (see id. § 1002.6 [d] [2]).

Footnote 4:Other factors are whether the desired compensation is "comparable" to that for other analogous positions; "the nature, size, and complexity" of the provider's operations; and the qualifications and experience possessed by the executive or required for the position (id. § 1002.4 [a] [2]). The remaining factors consider the provider's process in determining executive compensation and efforts to seek similar candidates for lower compensation (id.).

Footnote 5:The agency will also consider the extent to which the relevant administrative expenses are "necessary or avoidable"; the "nature, size, and complexity" of the covered provider's operations; the "provider's efforts to monitor and control administrative expenses and to limit requests for reimbursement for such costs"; and "[t]he provider's efforts . . . to find other sources of funding" for administrative expenses (id. § 1002.4 [b] [2]).

Footnote 6:In his partial dissent, Judge Wilson correctly points out that some challenges to agency action raise nonconstitutional issues that may not present the concerns addressed in Boreali—such as claims that an agency has misinterpreted a statute (see e.g. International Union of Painters & Allied Trades, Dist. Council No. 4 v New York State Dept. of Labor, 
32 NY3d 198 [2018]) or has adopted a regulation inconsistent with enabling legislation or otherwise contrary to law (see e.g. Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249 [2004]). But, here, where petitioners challenge the agency's promulgation of regulations as unconstitutional under the separation of powers doctrine, our Boreali "coalescing circumstances" analysis is implicated.

Footnote 7:Contrary to petitioners' argument, this grant of authority is not an unconstitutional delegation of legislative power because the enabling legislation provides adequate standards to guide DOH pursuant to the legislature's policy choice. The enabling legislation instructs DOH to regulate the health care industry through the efficient management of state-run programs and state funds to ensure the best quality care for New Yorkers, as opposed to providing unfettered authority to tackle any broad social or public policy issue relating to public health.

Footnote 8:Further, contrary to the LeadingAge petitioners' argument, the hard cap regulations, which impact whether DOH accepts a provider in the first instance or maintains a relationship with the provider, do not conflict with Public Health Law § 2808, which governs how much to pay providers for services rendered.

Footnote 9:The Court is unanimous that the administrative expenses hard cap was a valid exercise of DOH's regulatory authority. And it is undisputed that there is significant overlap between the administrative expenses and executive compensation hard caps—executive compensation is, in fact, a type of administrative expense. Judge Garcia concludes, in essence, that the executive compensation hard cap is not needed because "once the administrative cap controls, the executive compensation cap has no effect on money spent on program services" (Garcia, J., dissenting op at 
273). The fact that a regulatory provision may be duplicative or—in one Judge's view—unnecessary in relation to the achievement of the legislative goal does not make it ultra vires. If DOH could have adopted the executive compensation hard cap as a legitimate restriction on the use of state health care funding, that act was not rendered invalid by the fact that the agency also adopted the administrative expenses hard cap—which regulates the use of state funds in complementary manner.

Footnote 10:For the same reasons, at best, the fourth Boreali factor is neutral regarding the soft cap. On the one hand, DOH clearly relied on its expertise in the health care industry in attempting to direct funds away from executive compensation, and the waiver provisions were tailored to the health care industry and reflect quality of care goals. However, the soft cap exceptions are not directly tied to efficiency or quality of care and do not clearly emanate from DOH's expertise in the health care industry. Rather, they appear to reflect a policy choice to soften the effect of the executive compensation ceiling on covered providers.

Footnote 11:Indeed, as one would expect, procurement regulations implementing the "integrity" requirement typically address whether the contractor has made "false representations of material fact," concealed requested information, committed prior licensing violations, has been the subject of criminal charges, or the like (see e.g. 18 NYCRR 504.5). We are confounded by the suggestion in Judge Wilson's partial dissent that our analysis somehow undermines such regulations.

Footnote *:The majority suggests that the waiver provisions contained in 10 NYCRR 1002.4 "excuse application of the regulations in situations where an important aspect of the legislative goal—the provision of high-quality care—would be obstructed" (majority op at 
264). An unconstitutional exercise of regulatory authority cannot be saved with a mechanism for convincing the agency to forebear enforcement. Further, as noted at oral argument, in the five years since the regulation took effect, there is nothing in the record to indicate that DOH has ever issued a waiver.

Footnote 1:Governor Clinton was also concerned with prevailing wages and salary maximums, being intimately involved in setting pay rates for militiamen and the tricky business of paying providers of essential war supplies. Those pay scales represented, as one might expect, across-the-board salary caps (see e.g. George Clinton, No. 664, Pay of Continental Troopers, dated Aug. 9, 1777, 2 Public Papers of George Clinton 157).

Footnote 2:While the present text of the relevant sections of our State's Constitution (NY Const, art III, § 1; art IV, § 1) date from the Constitution of 1821 (Robert Allan Carter, New York State Constitution: Sources of Legislative Intent 35 [2d ed 2001]), the phrases at issue in this case, as well as the basic concept of separation of powers, derived from the original Constitution of 1777, albeit phrased slightly differently in that document (see 4 Charles Z. Lincoln, Constitutional History of New York 454-461 [1906]).

Footnote 3:The majority acknowledges the force of this point but says that Boreali is "implicated" because the petitioners are challenging the agency's promulgation of regulations under the separation of powers doctrine (majority op at 
261 n 6). This gets matters precisely backwards: "[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter" (Ashwander v TVA, 297 US 288, 347 [1936, Brandeis, J., concurring]; see generally McKinney's Cons Laws of NY, Book 1, Statutes § 150 [a]). Because the majority rejects (or, more precisely, ignores) parties' claims that the statutes at issue here would effect an unconstitutional delegation if interpreted to support either cap, there is no Boreali issue at stake here. The first Boreali step—the acknowledgement that the statute has a plausible reading that would empower the agency to do the challenged act—is missing. Moreover, we should be especially mindful of the merits of constitutional avoidance because of the nature of our jurisdiction (NY Const, art VI, § 3 [a] [2]).

Footnote 4:The majority may be hinting at Boreali factor one, whether "the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems" (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 179-180 [2016] [internal quotation marks and brackets omitted]; see Boreali, 71 NY2d at 12-14) when it describes the soft cap as "reflect[ing] a choice between competing public policy interests, rather than mere implementation of the legislature's chosen goal" (majority op at 
269). If so, the majority is rewriting that Boreali factor, which looks at whether the legislation is bereft of guidance, rather than providing the guidance that the agency is disregarding. In that latter case, the agency is simply acting contrary to law.

Footnote 5:The briefs, the majority's opinion, and indeed our past opinions, all have occasionally been somewhat loose in their use of the word "delegate." The legislature can "delegate" not one iota of its authority—hence the "nondelegation doctrine." When legislation passes a law requiring action by the executive, it is empowering the executive to act within that sphere, because the executive draws power from its constitutional duty to enforce the laws (and certain other independent heads of power not at issue in this case).

Footnote 6:I footnote for another day the constitutional problems presented by relying on the mere introduction of legislation. The legislature cannot do anything except through resolution of one house (in very limited cases [NY Const, art III, § 9]) or, much more usually, both houses and the Governor (NY Const, art III, § 14). That some legislator has introduced a bill in the legislature should be entirely irrelevant to our determination of whether the Constitution authorizes the Governor to engage in some executive action or another (see Boreali, 71 NY2d at 18-19 [Bellacosa, J., dissenting]). The majority perhaps realizes this problem and attempts to ameliorate it by limiting consideration to bills that made it out of committee, but the fundamental problem remains.

Footnote 7:One wonders why the majority has removed from the deck our usual get-out-of-Boreali-factor-three-for-free card, which is that "legislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences" (Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 225 [2017] [citation and brackets omitted]). My hope is that its omission here, coupled with Acevedo, spells the demise of factor three.

Footnote 8:Because the question in Campagna was the statutory one of whether the Secretary "exceeded whatever authority" she had under the statute (73 NY2d at 243), we did not apply Boreali. The same should be true here.

Footnote 9:See e.g. Boreali, 71 NY2d at 11-12 ("policy-making" is "legislative"); Statewide Coalition, 23 NY3d at 698 (invalidating soda portion size rule in part because it "evidenced a policy choice"); Bourquin v Cuomo, 85 NY2d 781, 787 (1995) (upholding challenged commission because it did not form "specific policy"); Matter of New York State Health Facilities Assn. v Axelrod, 77 NY2d 340, 346 (1991) ("An agency cannot by its regulations effect its vision of societal policy choices").

Footnote 10:The governor does not enjoy the full measure of "[t]he executive power" as that phrase was understood at common law, then or now—in particular, a range of appointees and other officials exercise powers commonly understood as executive (such as prosecuting criminal cases) but are not controllable by the governor except in limited ways spelled out by the Constitution or particular laws (see Rapp v Carey, 44 NY2d 157, 165 [1978]). Here, the Governor was acting in an area in which the Constitution grants him the full measure of the executive power, issuing an order to an officer who serves at his pleasure: a "commissioner," i.e., one who acts on commission—a commission from the governor.

Footnote 11:See Brian Nearing, Big Cheese Stash Getting Bigger, New York Production Climbs, Albany Times Union, Sept. 11, 2018, https://www.timesunion.com/business/article/Big-
cheese-stash-getting-bigger-New-York-13218466.php (noting that New York State alone produces enough cheese to give every person in the state 45 pounds per year).

Footnote 12:See also 4 Charles Z. Lincoln, Constitutional History of New York at 470-471 (1906) ("The clause requiring the governor to 'expedite all such measures as may be resolved upon by the legislature,' which was also included in the first Constitution, was a distinct recognition of the governor's executive authority. The legislature is to make the laws and the governor is to execute them, and to use all the means placed at his command to effectuate the legislative purpose").

Footnote 13:See e.g. Boreali, 71 NY2d at 12 (plethora of exceptions indicated smoking ban didn't objectively advance the legislated public health goal); Matter of New York State Health Facilities Assn. v Axelrod, 77 NY2d 340, 348 (1991) (quota on the number of Medicaid patients that must be seen by a Medicaid contractor were permissible because they objectively advanced the statutorily expressed policy goal of addressing public need); Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 866 (2003) (setting time limits objectively advanced the policy goals of the no-fault insurance legislative scheme); Statewide Coalition, 23 NY3d at 699 (soda portion size ban had so many exceptions, and was so indirectly connected to health consequences of soda consumption, as to not objectively advance the public health goals articulated in the enabling sections of the City Charter); Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 609, 611 (2015) (adopting just one taxi model rather than several objectively advanced the goals of "public comfort and convenience"); Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 182 (2016) (after jettisoning part of Boreali on preservation grounds, finding that flat-out ban objectively advanced legislature's goals articulated in parks legislation); Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 223 (2017) (licensing regulations objectively advanced legislature's goal of getting drunk drivers off the road); Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d 601, 612 (2018) (mandating vaccinations objectively advanced legislature's goal of "prevent[ing] the spread of communicable diseases").

Footnote 14:Accordingly, because the soft cap is an integral part of the hard cap, the majority's analysis of the arbitrariness and capriciousness of the hard cap (majority op at 
267-268) is applicable with full force to the soft cap, and accordingly I disagree with Judge Garcia's contrary contention on this score (Garcia, J., dissenting op at 
276-277).

Footnote 15:Contrast Under 21 (65 NY2d at 359), where the considerations the State was adopting were quite different—namely, its moral opprobrium for contractors who discriminated on the basis of sexual orientation.